UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA          Docket No.: 08-cr-0243 (KMK)

        -against-                             **DEFENDANT'S**

CONSTANCE G. POST and                **NOTICE OF MOTION**
**WAYNE CHARLES,**

                Defendants.
------------------------------------------------------X


**TO:**      **PREET BHARARA, UNITED STATES ATTORNEY**
            **SOUTHERN DISTRICT OF NEW YORK**

            **ANDREW DEMBER, ASSISTANT UNITED STATES ATTORNEY**
            **DANIEL FILOR, ASSISTANT UNITED STATES ATTORNEY**

---

**DEFENDANT WAYNE CHARLES' POST-TRIAL MOTION FOR A
JUDGMENT OF ACQUITTAL AS TO THE INDICTMENT PURSUANT
TO FEDERAL RULE OF CRIMINAL PROCEDURE 29 AND/OR FOR
A NEW TRIAL UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 33**

---

                        Respectfully submitted,

                        **STEPHEN R. LEWIS, ESQ.**
                        **Stephens, Baroni, Reilly & Lewis, LLP**
                        *Attorneys for Defendant, Wayne Charles*
                        175 Main Street, Suite 800
                        White Plains, New York 10601
                        Telephone: (914) 683-5185

## PRELIMINARY STATEMENT

Federal Rule of Criminal Procedure 29(c) permits the Court to entertain a timely motion for acquittal after the jury is discharged. The Defendant Wayne Charles, by and through his attorney, respectfully moves this Court to enter a judgment of acquittal pursuant to Rule 29(c) and/or for a new trial under Federal Rule of Criminal Procedure 33.

## STATEMENT OF FACTS

The Court is respectfully referred to the transcript of the trial for a full accounting of the witness testimony and evidence. As this Court is obviously aware, following a lengthy trial, on November 30, 2015, the jury returned a unanimous verdict of Guilty as against both Defendants.

At the close of the Government's case and at the close of all the evidence, the Defendant moved this Court for a judgment of acquittal as to the charges in the indictment pursuant to Rule 29(a). Argument was heard prior to the jury verdict and the Court reserved on the applications. (See trial transcript ("TT") 5744-5748).[1]

Following the verdict, on November 30, 2015, motions under Federal Rules of Criminal Procedure 29 and 33 were deemed to have been made subject to an agreed upon briefing schedule. (TT 5778-5779).

## STANDARD OF REVIEW

The standard of review for a Rule 29 motion is to examine the evidence presented against the Defendant in the light most favorable to the Government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v.

---

[1]  Reference to the trial transcript will hereafter be designated as "TT" followed by the page number.

Virginia, 443 U.S. 307, 319 (1979). A criminal defendant who challenges the sufficiency of evidence shoulders a heavy burden, but not an impossible one. United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000); United States v. Nusraty, 867 F.2d 759, 765-67 (2d Cir. 1989).

The Defendant also moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Rule 33 authorizes a district court, upon the defendant's motion, to vacate any judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a); United States v. Ferguson, 246 F.3d 129, 134 (2nd Cir. 2001) citing United States v. Sanchez, 969 F.2d 1049, 1414 (2nd Cir. 1992). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33." United States v. McCourty, 562 F.3d 458, 475 (2nd Cir. 2009). "By its terms, Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2nd Cir. 1992). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict." United States v. Ferguson, 246 F.3d 129, 134 (2nd Cir. 2001) (quoting Sanchez, 969 F.2d at 1414). In deciding this question, "the judge must examine the totality of the case. All the facts and circumstances must be taken into account." Sanchez, 969 F.2d at 1414. The Court however is not required to view the evidence in the light most favorable to the Government. United States v. Ferguson, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999) (citing United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980). See also, United States v. Sanchez, 969 F.2d at 1413; aff'd, United States v. Ferguson, 246 F.3d 129 (2d Cir. 2001). The trial Court therefore has "broader discretion" to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29. Ferguson, 246 F.3d at 134.

3

## ARGUMENT

The Defendants are charged with conspiracy and mail fraud. One essential aspect of the

Indictment alleges that Charles and Post acting together and conspiring together sought to steal

$500,000 from the City of Mount Vernon through a loan made to Charles by the Mount Vernon

Urban Renewal Agency at Posts's recommendation. See redacted indictment ¶ 9. The indictment

further states at ¶'s 9 and 10:

> By resolution dated October 19,1999, the MVURA approved POST's
> proposal and authorized a $500,000 loan, which contained the
> following conditions and restrictions, among others:
>
> a. The Charles Group was obligated to make
>    interest payments on the loan beginning
>    the first day of the month following Mount
>    Vernon's first disbursement of loan funds;
>
> b. Upon completion of construction on the
>    Third Street Property, through a designated
>    private funding source, The Charles Group
>    was required to repay $250,000 of the
>    loan to Mount Vernon;
>
> c. The loan was to be used for "materials only."
>
> 10. From in or about August 2000 through in or about August 2003,
> pursuant to the loan agreement, POST directed the MVURA to pay
> out loan proceeds totaling $500,000 to the Charles Group. The loan,
> however, was not reflected in the books and records of the MVURA.
> Although obligated to pay interest shortly after Mount Vernon's
> initial disbursement of money to the Charles Group in August of
> 2000, CHARLES did not make any interest payments during the
> period of construction. After construction was completed, pursuant
> to the terms of the loan agreement, a private funding source repaid
> $250,000 of the loan and CHARLES continued to owe the City of
> Mount Vernon the remaining $250,000 plus interest. CHARLES did
> not make those payments.

The Government's theory of money or property fraud advanced to the jury was that the loan

4

was fraudulently obtained in the first instance and then hidden to avoid repayment. The proof failed to support this theory of criminality when it is seen as two separate debt obligations.

The proof at trial demonstrated that as early as the Summer of 2002 Charles wrote to Post and Albano to schedule a closing of the CPC loan to obtain permanent financing and "pay off your construction loan." (Gov. Ex. 1140). On September 18, 2003 a closing was held on the CPC permanent financing loan. From the new loan for $638,000, the Mount Vernon Urban Renewal Agency was paid the $250,000 of principal as originally contemplated plus $19,307.04 in accrued interest payments due it under the original Note (Gov. Ex 1230).

However the $250,000 balance owed to Mount Vernon became the subject of a separate Mortgage Note payable to the Mount Vernon Urban Renewal Agency dated 9/18/2003, secured by mortgage against the East Third Street Property, all filed in the Westchester County Clerks Office as a matter of record under control number 441671493 (Gov. Ex 1241). At the September 18, 2003 closing, the Lender, Community Preservation Corporation ("CPC") and the Mount Vernon Urban Renewal Agency also entered into a Subordination Agreement specifying that the Loan from CPC was secured by a superior mortgage and that the new $250,000 loan was secured by a second or subordinate mortgage securing Mount Vernon's interest in the property. (Gov. Ex 1229). In fact, based upon the new debt obligations filed with the County Clerks Office, the original $500,000 loan from Mt. Vernon to Charles was satisfied and a Satisfaction of Mortgage was filed in the Westchester County Clerk's Office. (Gov. Ex 1277, 1278).

These facts demonstrate the absence of intent to defraud which is a requisite element of the charges. The jury instruction given by this Court at trial outlined these elements. The Court, as to the conspiracy charge stated: "In sum, the defendant you are considering with an understanding of

5

the unlawful character of the conspiracy, must have intentionally engaged, advised or assisted in it for the purpose of furthering the illegal undertaking." (TT 5660)

As to the second count of mail fraud the Court charged that the Government had to prove "the defendant you are considering, knowingly and willinglyfully participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific intent to defraud." (TT 5662-5663). Key to a finding of guilt is intent to defraud. The Government in its summation repeatedly harped as to the Defendants' lying and deception on loan and other documents; But deceit and deception is insufficient. As this court charged the jury, "[I]n order for you to find that there was a scheme to deprive the City of Mount Vernon, its citizens, and/or HUD, of money and property, you must find that some actual harm or injury was contemplated by the defendant you are considering..." (TT 5666).

The existence of the second mortgage and the proof of payment of the first $500,000 mortgage as evidenced by the Satisfaction of Mortgage filed in the County Clerk's Office, the full payment of the $250,000 plus accrued interest and the secured second position mortgage filed as of record, go to the lack of fraudulent intent and any contemplated harm to the City, its citizens and/or HUD.

An essential element of mail fraud or conspiracy to commit mail fraud is the intent to defraud and the Government "must show that some actual harm or injury was contemplated by the schemer." *In re Gordon* 68 F.3d 577, 580 (2d Cir. 1995) quoting *United States v. D'Amato*, 39 F.3d 1249, 1256-57 (2d Cir. 1994).

The Government in their summations repeatedly accused the Defendant of lies and deceit. However, as stated, misrepresentations amounting only to a deceit are insufficient to support a mail

6

fraud prosecution. D'Amato at 1257; United States v. Starr, 816 F. 2d 94, 98 (2d Cir. 1987). The

Government must prove that actual harm or injury was envisioned as part of the fraudulent scheme.

Regent Office Supply Co., 421 F. 2d 1174, 1180 (2d Cir. 1970).

Our Circuit has consistently ruled that a scheme to defraud money or property requires proof

that the Defendants contemplated actual harm or injury to their victims. In United States v. Bifulco.

127 Fed. Appx.548, 549-550 (2d Cir. 2005), the court outlined the issue:

> "Critical to a showing of a scheme to defraud [under the mail and
> wire fraud statutes] is proof that [the] defendants possessed a
> fraudulent intent." United States v. Starr. 816 F.2d 94, 98 (2d Cir.
> 1987). While the government does not have to prove that the scheme
> to defraud caused actual injury, "it must ... prove that defendants
> contemplated some actual harm or injury to their victims. Only a
> showing of intended harm will satisfy the element of fraudulent
> intent." Id. Starr emphasized the importance of this intent requirement
> to a mail or wire fraud conviction, observing that "misrepresentations
> amounting only to a deceit are insufficient to maintain a mail or wire
> fraud prosecution. Instead, the deceit must be coupled with a
> contemplated harm to the victim." Id. Similarly, "it is not sufficient
> that [the] defendant realizes that the scheme is fraudulent and that it
> has the capacity to cause harm to its victims." Guadagna, 183 F.3d at
> 129; see also United States v. Gabriel, 125 F.3d 89, 96-97 (2d Cir.
> 1997) (holding that "some realization" that a scheme may be
> fraudulent and potentially harmful does not alone automatically
> satisfy the "intent to harm" requirement of the mail fraud and wire
> fraud statutes); United States v. Dinome, 86 F.3d 277. 283 (2d Cir.
> 1996) (holding that the government must prove defendant's intent to
> harm for a § 1341 or § 1343 conviction).

In United States v. Starr, the appellate court recognized that actual harm or injury is not a

requisite element and that the victims of the scheme need not be actually injured, however the Court

citing its prior precedent in Regent Office Supply Co., recognized that the essential element of

fraudulent intent can only be sustained by proof that actual harm or injury was contemplated by the

defendant. United States v. Starr, 816 F.2d 94. 98 (2d Cir. 1987) citing United States v. Regent

7

Office Supply Co., 421 F.2d 1174 (2d Cir. 1970.

The intent to harm the fraud's victims cannot be diluted, and where the scheme to defraud does not cause injury then the prosecution must produce evidence apart from the scheme to defraud to prove the element of intent to defraud. The Second Circuit explained this in United States v. D'Amato. 1994 U.S. App. LEXIS 30393. 21-22 (2d Cir. N.Y. 1994):

> Because the defendant must intend to harm the fraud's victims, "misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." Starr, 816 F.2d at 98. "Instead, the deceit must be coupled with a contemplated harm to the victim." Id. In many cases. this requirement poses no additional obstacle for the government. When the "necessary result" of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself. Regent Office Supply Co., 421 F,2d at 1181 (quoting Horman v. United States, 116 F. 350. 352 (6th Cir.), cert. denied, 187 U.S. 641, 47 L. Ed. 345, 23 S. Ct. 841 (1902)). Where the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent. See, e.g., Starr, 816 F.2d at 98-99.

In United States v. Mittelstaedt, 31 F.3d 1208 (2d Cir. 1994) the Appellate Court reversed convictions and held that concealment of material information does not give rise to mail fraud unless the omission can or does result in some tangible harm. Lack of information which might have made an impact as to how a municipality spent its money, without more, does not constitute a deprivation of "property" as contemplated by USC § 1341. Id at 1217.[2]  Accordingly, the absence of intent to defraud or proof that the Defendant contemplated harm to the City, its citizens or HUD, necessitates the granting of the Rule 29 motion.

---

[2]  This Court has questioned whether such a "narrow" reading of "property" survives in light of subsequent holdings of the Appellate Courts at least as to mail fraud cases involving government entities. United States v. Post, 950 F. Supp. 2d 519, 540 fn8 (Karas, J., U.S. Dist. Ct. 2013).

## MOTION FOR A NEW TRIAL UNDER RULE 33 OF
## THE FEDERAL RULES OF CRIMINAL PROCEDURE

### DISCUSSION

Federal Rules Criminal Procedure ("FRCrimP") 33 provides that "the court on motion of a defendant may grant a new trial to that defendant in the interest of justice." The Government in its rebuttal summation engaged in conduct which deprived the Defendant of a fair trial.

In its initial summation, the prosecutor repeatedly accused the Defendant Charles of lying and stealing: "he told them lots of lies" (TT 5312); "Why does he lie ..." (TT 5315); "he lied" (TT 5371); "he lies" (TT 5372); "lied" (TT 5376). His verbal assault on Charles included a personal accusation of "highway thievery" (TT 5351); "stealing" (TT 5371); "steal more money" (TT 5358); "part of the scheme to keep stealing the money", "continuing to steal" (TT 5391); "the phony Meacham letter that was sent to the Urban Renewal Agency to get more money out of it, to steal more money ..." (TT 5392).

However, this ad hominum attack reached a new dimension when the prosecutor mischaracterized trial testimony to convince the jury of the Defendant's guilt. On rebuttal summation, the prosecutor stated:

> Now, if you've learned nothing else from this case, you should have learned that Wayne Charles loves to fabricate documents and one of the fascinating documents you learned he provided, it wasn't introduced by us, it was actually introduced during cross examination of Joseph Sparano.
> Mr. Sparano was put on the witness stand strictly to tell you about one of those phony leases that Mr. Charles submitted to CPC to get them to come in and take out his loan and to give him more money. And one of those phony leases was signed by - - was supposed to be signed by Mr. Sparano, but he got on the stand and told you, no, that's not my signature on that lease.

During the course of Mr. Sparano by Mr. Lewis, he showed him another document. He asked him a number of questions about being in businesses with Wayne Charles and, gee, weren't one of those businesses like the tax service business you were going to have at the 3 East Third Street building?

He said, yeah. And then he introduced into evidence a business certificate. We're going to put it up on the screen. You'll remember this, I think. It's a business certificate.

See, not only is Mr. Charles good at fabricating documents, apparently he's really good at duplicating peoples' signatures.

Remember Joseph Sparano? I got up back on redirect examination of Mr. Sparano after Mr. Sparano told had you, yes, this is his document, that's his signature. And I pointed out to Mr. Sparano that he - - I asked him how you spelled his first name. He told us the typical way you spell the name Joseph. Then he looked carefully and he realized, oops, that couldn't be his signature, really, because when he signs his name, he usually spells it correctly. And it's not mis - - it's not spelled there.

He got off the stand, almost muttering, boy, that really looked like my signature. Obviously, you can see it wasn't. Okay? It was a phony document likely prepared by Wayne Charles and signed by Wayne Charles.

    MR. LEWIS: Objection.

    THE COURT: Overruled. It's argument.

(TT 5634-5636).

The problem is that the witness never gave such testimony. On his redirect examination, the prosecutor showed Mr. Sparano a signed, notarized business certificate for M&J Tax Services dated January 18, 2006 that had been received in evidence as Defendant's Exhibit C-JS-A. The Government asked the witness:

> Q.    Mr. Sparano, this is now in evidence. It's C-JS-A that Mr. Lewis just showed you. Do you see that?
> A.    Mm-hmm.
> Q.    Did you prepare that document?
> A.    No, I don't believe - - I don't believe so.
> Q.    Okay. Well, do you see where it says on the top there M&J Tax Services?
> A.    Right.
> Q.    Was that a company that you were going to form?

A.     I didn't really realize that we had selected a name, but evidently we had.

Q.     Okay. Well, let's go down there. You're familiar with the next entry there. It says at 5 Third Street. You're familiar with that address, right?

A.     Absolutely.

Q.     Okay. And it says, "My full name is," and "I reside at," and your full name is Joseph Sparano; is that right? It's typed in there?

A.     Yes.

Q.     Okay. And the address there is accurate, 131 Rosehill Avenue?

A.     That is correct.

Q.     Okay. And - - well, just - - just - - if we can just focus a little bit on the top there. Is your - - is your name spelled correctly there, Joseph Sparano as typed in?

A.     Yes.

Q.     Okay. How about your - - what you said was your signature? Do you see "Sparano" there?

A.     Yes. It's not spelled correctly.

Q.     Well, is Sparano correctly spelled?

A.     Yes.

Q.     How about Joseph?

A.     No.

Q.     When you sign your name, do you spell the name correctly or incorrectly normally?

A.     Usually correctly.

Q.     But you've misspelled your name when you signed that document; is that what you're telling us?

A.     It looks like it, because this looks like my signature.

Q.     Well, is it normal practice of yours to misspell your first name when you sign your name?

A.     We could have been drinking wine. I don't know.

Q.     My question is, is it your normal practice?

A.     No. No, it is not. Of course not.

Q.     That's not the way you spell your name, is it?

A.     No. Of course not.

Q.     Are you sure that's your signature on this document, Mr. Sparano?

A.     It looks like it. That's how I sign my name, though. I know my name is misspelled. That's the only thing that, you know -

Q.     Well, my last question is: Do you normally misspell your first name when you sign it?

11

A.     No. Everybody knows not to - -

Q.     Thank you, Mr. Sparano.

MR. DEMBER:   I have nothing further, Your Honor.

MR. LEWIS: Can I have those back, please?

MR. DEMBER:   Of course. This is the original.  Mr. Lewis, this is the original.

MR. LEWIS:   May I approach the witness?

THE COURT:   Yes.

RECROSS-EXAMINATION

BY MR. LEWIS:

MR. LEWIS:   Can you put this up, please.

THE WITNESS:   Damn, it looks like my signature.

THE COURT: Wait for a question.

Q.     Mr. Sparano, there is a notary, correct, on this?

A.     Yes.

Q.     In fact, if you run your finger on the document, there is a seal of a notary, right?

A.     Yes.

Q.     And you know who that notary is, don't you?

A.     I'm bad with names, though.

Q.     Didn't you work with Miriam?

A.     This is a Spanish girl.

Q.     Do you remember a girl named Miriam that you worked with at East Third Street?

A.     Very faintly. Yes, there was - this girl was at East Third Street.

Q.     Okay.

A.     This girl was at East Third Street.

Q.     All right. Thank you very much.

A.     I don't remember her that well, though.

THE COURT: Okay. Mr. Dember? Mr. Tanner, you're done, right?

MR. TANNER: I'm done, Judge.

THE COURT:   Okay.

REDIRECT EXAMINATION

BY MR. DEMBER:

Q.     This person, this notary at Third Street, was she a notary, this Miriam you think you remember?

A.     There was a girl there. I - - I really don't remember this occurrence.

Q.     Well - -

A.     I don't remember. I don't - - but that's not uncommon with me. Ten years ago, I'm not going to remember something.

Q.     The name of the notary on the document is Miriam - - I will

read it from my copy. It's easier to read. Florenzin. It looks like Florenzin. You don't know that person, do you?

A.    There was a girl there, but do I know the person? I don't remember her. I can't say I remember her.

Q.    And when Mr. Lewis was just asking you about working in Third Street, is that when you and Mr. Charles had that - - were trying to set up that accounting business?

A.    That is correct.

Q.    With the computers on the first floor -

A.    Yes.

Q.    - - that you told us about?

A.    Yes.

Q.    Thank you very much.

MR. DEMBER: Nothing further, Your Honor.

(TT 2168-2173)

Contrary to the statements made in the rebuttal summation, the witness did not disavow his signature or the authenticity of the document. He never, as the prosecutor told the jury in his rebuttal summation, "he realized, oops, that couldn't be his signature ..." (TT 5636).

In that context, the prosecutor told the jury, "See, not only is Mr. Charles good at fabricating documents, apparently he's really good at duplicating signatures." (TT 5635). He went further and stated: "He got off the stand, almost muttering boy, that really looked like my signature. Obviously, you can see it wasn't. Okay? It was a phoney document likely prepared by Wayne Charles and signed by Wayne Charles" (TT 5636).

This was the Government's fabrication of evidence, which in the context of the summation and the continued verbal attack on the Defendant's honesty, deprived him of a fair trial. The next day, as the jury was about to begin its deliberations, the issue was addressed with the Court and application was made for a mistrial.

13

I preserved this objection. The government materially misrepresented the testimony of Joseph Sparano on May 27, 2015, and I've provided the Court with a copy - -

THE COURT: I've read it.

MR. LEWIS: - - of the transcript.

THE COURT: Okay.

MR. LEWIS: And he never disavowed that it was his signature. He said it looked like his signature. He never got off the stand muttering. The second page reflects that when I got up and I asked that the document be put up, he said, damn, it looks like my signature.

At no time did Joseph Sparano ever disavow that this was his signature, nor was there any proof in the record that it was a phony document that Mr. Dember told the jury yesterday. Accordingly, my application, based upon this misconduct, is, in fact, for a mistrial.

And also when the specific business certificate was put up on the screen, it's very interesting that the notary stamp that was below Mr. Sparano's signature was not shown to the jury. It was specifically placed on the ELMO so that the notary stamp was not visible and there was a notary stamp on the document.

THE COURT: Which he testified to.

MR. LEWIS: On May 27.

(TT 5724-5725)

. . .

The Court inquired how this could be remedied.

MR. DEMBER: The alternative is to tell the jury to disregard that part of my summation, but that's - - there's a mistrial based on a document your Honor, that really has nothing to do with this case. It was Mr. Sparano's testimony - - Mr. Sparano's - -

THE COURT: If it had nothing to do with this case, you shouldn't have been talking about it.

MR. DEMBER: Well, your Honor, Mr. Sparano was called to the witness stand to talk about a lease-

THE COURT: I know, but - -

Seems to me, Mr. Lewis, there's one of two things we can do. One is, I can cure it by way of some sort of instruction, either disregard that argument by Mr. Dember, or I could say that it's not true, or I could give you a three-minute surrebuttal to address it, if you want.

MR. LEWIS: I'd rather it come from the front of the room.

THE COURT: Okay. So what would you like me to tell the jury?

MR. LEWIS: That yesterday during the rebuttal summation - -

THE COURT: Do you have the transcript so I can read from it? Okay. Go ahead.

14

MR. LEWIS: Yesterday during the rebuttal summation there was a reference to testimony of Joseph Sparano and Mr. Dember indicated that Mr. Sparano looked at his signature and disavowed that it was his signature, and I'm charging you that you may disregard that statement and, in fact, that Joseph Sparano, during his testimony on May 27, never disavowed that it was his signature.

THE COURT: All right. Any problem with that, Mr. Dember?

MR. DEMBER: I'm not going to object to that.

THE COURT: I think it's entirely appropriate and I think it's sufficient to cure the misstatement by Mr. Dember. I don't think a mistrial, therefore, is necessary in that regard.

(TT 5728-5729).

. . .

The Court then gave its curative charge:

The other thing to talk to you about is yesterday during his rebuttal summation Mr. Dember talked about testimony by Mr. Sparano, and in particular, about his signature on a document.

And this is testimony form May 27, right, of this year?

MR. LEWIS: That's correct, your Honor.

THE COURT: May 27 of this year.

And Mr. Dember explained how he asked Mr. Sparano on redirect examination to take a look at the document and see if it was his signature and asked about the spelling of his name, and Mr. Dember said that yesterday that Mr. Sparano testified he looked carefully and realized, oops, that couldn't be his signature.

The transcript is going to be made available to you, but what I want to let you know is that the testimony that Mr. Dember referred to, there is no testimony that Mr. Sparano said that that couldn't be his signature. Okay? So that statement doesn't square with the testimony.

Again, you can get the transcript, but I just wanted to make that point before you begin your deliberations.

And with that, finally the case is yours. Okay?

(TT 5735-5736).

Unfortunately, the curative charge given by the Court to the jury was not what was requested and consented to. They were not affirmatively told that the witness had not disavowed his signature. The Court informed the jury that there was "no testimony that Mr. Sparano said that it couldn't be his signature." (TT 5736). The certainty of his testimony therefore remained portrayed as at best

15

equivocal where in fact he had testified "this looks like my signature"; "that's how I sign my name"

(TT 2170).

The accusation of a phony document created and signed by Wayne Charles, an accusation

totally unsupported by the record and the presumption of authenticity by virtue of the notary seal,

was not cured by the Court.

> THE COURT: Well, no. I mean, to the extent he's looks like my
> signature but he's acknowledging that his name is misspelled, then at
> least there's some room for argument. I don't think it's a very good
> argument but it's argument.
> I think it's very different from saying what somebody testified
> to, and in fact, he didn't. I think there's conclusive proof of that, so
> I'm going to cure that error. The rest of it, it seems to me, is
> argument. I understand why think you (sic) have the better of the
> argument. I understand that. But if that were a basis for a mistrial,
> then we would be having mistrials in every case. Somebody has the
> better of the argument.
> (TT 5731).

But in this instance, the Government had no good faith belief that the signature was a forgery

or that the document was not real. They never investigated the notary, Myriam Florenzin, who

Sparano acknowledged as being a Spanish girl he worked with at East Third Street that he didn't

remember. Sparano did not deny his signature: "It looks like it, because this looks like my

signature." Even when pressed by the prosecutor:

> Q.    Are you sure that's your signature ...
> A.    It looks like it. That's how I sign my name ...

Unlike the lease which Sparano disavowed signing, in this instance there was no good faith

basis, based upon his acknowledgment of signature and the notary stamp, to further accuse Wayne

Charles of forgery and tell the jury, "he's really good at duplicating signatures"; and "[i]t was a

16

phony document likely prepared by Wayne Charles and signed by Wayne Charles." (TT 5635-3636).

Having misrepresented Sparano as stating that it could not be his signature, the phony document and forgery scenario wrongfully resounded to the jury and as a defense exhibit.

The rebuttal summation also added another poisonous component to the fairness of the proceeding.

From the very beginning of the case, the jury was told by the defense that this was not a case of no-show jobs or billing for work not performed. In the opening statement, the jury was told unequivocally:

> This is not a case of no-show jobs or billing for services not performed. Let me say that again. The evidence in this case will not show payments for no-show jobs or for billing for services not performed. (TT 67).

The allegation of double billing was never addressed by the Government in either trial, that is until the rebuttal summation when the prosecutor knew the defense would not have the ability to address this issue and fairly present the entire picture. The prosecutor told the jury:[3]

> But, you know, since Mr. Lewis brought this letter to your attention, I feel compelled to bring something else to your attention about this letter. You see in the, oh, second paragraph there? It says, "You have a bill dated May 21, 2001, invoice number 43. We have no record of that," in big letters, "invoice"
> Now, this is a phony letter that Wayne Charles put together to

---

[3]  The prosecutor references the Jason Blake signed letter to Michael Leigh dated June 1, 2002 (Gov. Ex. 567) which was used by the defense in their summation to compare Blake's signature with his voter registration card (C-JB-A) and his mortgage (C-JB-B) all mounted on a poster board and displayed to the jury for comparative purposes. To suggest Wayne Charles was the first one to bring up the letter in summation is untrue. It was addressed by the Government in its principal summation: "The Jason Blake letter that was sent to Michael Leigh, you'll remember that one, the fictitious one, the actual envelope is in evidence there. That's part of the scheme too, to keep stealing the money, the money they were stealing from Mount Vernon by not giving it to Michael Leigh who was owed it." (TT 5391).

send to Michael Leigh so he wouldn't have to pay him. And he's telling him, well, we never got your invoice number 43. The letter is dated June 2002.

Well, we're not going to put this on the screen, we'll leave the letter on the screen.

If you go to Government Exhibit 299, one of the vouchers, okay, Mr. Charles submitted to get paid, okay, and you turned to the second page of Government Exhibit 299 and this voucher is dated May 28, 2001. So it's more than a year before this letter is written.

You go to the second page, there is Mr. Leigh's invoice number 43 attached. And if you go to the last page and add up all the numbers, you'll see that, in fact, that invoice was paid.

So that letter is just a lie. The year before Wayne Charles submitted invoice number 43 and got paid. Oh but there's more to it. Much more to it. Okay?

In your travels through the vouchers, go to Government Exhibit 382. 382 is a voucher dated June 21, 2002. It's 20 days after that letter was written, apparently. While you're perusing through Exhibit 382, go to the third page.

Now, Mr. Leigh told you when he got that letter he was very upset. Remember he was very upset when he got that letter. He had done everything he was supposed to do. But he said to you he reprinted out invoice number 43 and got it signed again. The third page of this exhibit is invoice number 43. The same exact invoice. Compare them in the two exhibits.

And here's the kicker. Here's the kicker. You go to the last page of Exhibit 382, what do you have? Oh, the payment record. See? Payment record. Payment was made. Okay? Wayne Charles billed twice. Double billed. Double billed for over like $2500 and Constance Post signed off on it. There is no limit to his thievery. No limit whatsoever. He's double billing also. Just when you thought he had stolen all kinds of different ways, here's another way he's stolen. It's not enough.

(TT 5637-5639).

The prosecutor's attempt to justify the double billing in his rebuttal because reference was made to the letter by the defense ("I feel compelled to bring something to your attention about this letter") was disingenuous. The Government sat on what they portrayed as a smoking gun, waiting to present it, knowing it could never be explained. In fact, its impact was dramatic. The first two

notes from the deliberating jury referenced the issue asking for the correspondence and the double billing documents. (Court Exhibits HH and II). Had the Government addressed double billing in its principal summation, the entire picture could have been presented to the jury: that Mike Leigh resubmitted the May 21, 2001 voucher to Ann May that was approved by her on June 5, 2002, and then submitted by Leigh to be sent to the Planning Department with three other invoices purportedly for the period May 8, 2002 through June 5, 2002 (Government Exhibit 382). The original sign off by Ann May on May 21, 2001 was not included by Leigh on the resubmitted voucher (Government Exhibit 299).

The Government knew that this "double billing" would have been addressed and diluted or diffused by the defense as nothing more than a clerical error brought on by Mike Leigh in resubmitting the already approved voucher for approval by his supervisor a year later without indication of the prior approval signature on May 21, 2001 (Government Exhibit 299). In light of the hundreds of processed invoices, this would have been realized as a mistake rather than proof of "thievery" without limits. Similarly, the juror's attention could have been brought to Government Exhibit 500HH which would have reflected a claim for compensation sent, approved and paid by the City for work performed, which incorrectly failed to add 7.75 hours of invoice 20022 that Micros Only never paid based upon a clerical error.

This all left the jury in a poisonous cloud that the defense was unable to diffuse creating a substantial prejudice and an unfairness that affected the interests of justice.

## ARGUMENT

Federal Rule of Criminal Procedure 33 provides that a court on motion of a defendant may grant a new trial if required in the interests of justice. A prosecutor's misrepresentation of testimony may require reversal because of the ultimate prejudice to the defense. United States v. Drummond, 481 F.2d 62, 64 (2d Cir. 1973). Where a prosecutor's remarks in summation exceed permissible bounds, and there is timely objection, the reviewing court is authorized to reverse if the error is not otherwise harmless. United States v. Young, 470 U.S.1, 13 (1985). In reviewing a claim for prosecutorial misconduct in summation, a determination must be made as to whether the comments caused the defendant "substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Collins, 40 Fed. Appx. 616, 618 (2d Cir. 2002) quoting United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002).

It is recognized that a defendant seeking to reverse a conviction based upon an improper comment in summation bears a "heavy burden" of demonstrating that "the comment, when viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudiced him, depriving him of a fair trial." United States v. Binday, 804 F.3d 558, 585-586 (2d Cir. 2015), quoting United States v. Farhane, 634 F.3d 127, 167 (2d Cir. 2011).

Mischaracterization of evidence by a prosecutor is forbidden. "It is clear of course that it is improper for a prosecutor to mischaracterize the evidence or refer in summation to facts not in evidence." United States v. Rosa, 17 F.3d 1531, 1548-49 (2d Cir. 1994), citing United States v. Richter, 826 F.2d 206, 209 (2d Cir. 1987). Improper remarks or a prosecutor's misrepresentation of testimony may require reversal because of an inevitable prejudice which infects the trial with

20

unfairness tantamount to a denial of due process. United States v. Bonventre, 2014 U.S.Dist. LEXIS 101304 (S.D.N.Y. July 24, 2014), citing United States v. Drummond, supra p. 63-64.

Although a drastic remedy, reversing a criminal conviction and granting a new trial is mandated where there is prosecutorial misconduct and a substantial prejudice that deprives a defendant of a fair trial. In making its assessment, the court must look at three factors: "the severity of the misconduct; the measures adopted to cure the effects of the misconduct; and the certainty of conviction in its absence." United States v. Valentine, 820 F.2d 565, 570 (2d Cir. 1987); United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981) (per curiam) cert. denied 456 U.S. 989 (1982). In analyzing "severity", the courts consider whether the misconduct was intentional. "The prosecutor has a special duty not to mislead; the government should, of course, never make affirmative statements contrary to what it knows to be the truth." United States v. Valentine, supra p. 570, quoting United States v. Della Universita, 298 F.2d 365, 367 (2d Cir. 1962).

Here, the Government gave no explanation as to why it misrepresented the Sparano testimony. The Court in agreeing to give the curative charge requested by the defense charged different language than that requested and consented to by the Government. The curative charge given did not specifically inform the jury that Sparano never disavowed his signature and the Court refused to cure the phony document remarks and the Government's representation that Wayne Charles had obviously forged the document.

The defense in this case had a central theme that Wayne Charles never intended to defraud or steal money from the City of Mount Vernon, its citizens or HUD; that he never contemplated any financial harm to them. The rebuttal summation attacked the credibility of the defense and indirectly counsel. The subliminal suggestion (which was not subliminal but tacit) was that Charles' counsel

had introduced into evidence a phony document [C-JS-A] despite the fact Sparano acknowledged it appeared to be his signature, and the Government had no information that the notary jurat was not valid or real.

So too, the "double billing" trap set in the rebuttal summation was intentional, and strategic, but unfair. It attacked the credibility of the defense, a defense that was established from the first day of the trial in the opening statement. With this backdrop, the improper statements of the rebuttal summation taken as a whole created a substantial prejudice infecting the proceeding with an unfairness that rendered the resulting conviction a denial of Mr. Charles' rights of due process under the Fourteenth Amendment.

### ADOPTION BY REFERENCE TO
### DEFENDANT'S PRIOR POST TRIAL MOTION

After the Defendant's first trial in 2009, his counsel submitted post trial motions seeking Rule 29 and 33 relief. The Defendant herein adopts and advances the arguments advanced in that prior motion Points I and II addressing the 500,000 loan, the argued constructive amendment and/or prejudicial variance regarding the loan and the Statute of Limitations argument advanced in Point II. See Defendant's Post Trial Motions dated January 21, 2010, filed January 22, 2010, Document Number 53 in the Docket Sheet.

## CONCLUSION

For the reasons set forth herein, it is requested that the Court grant the Defendant, Wayne Charles' motion for Rule 29 relief as to both counts of the indictment and/or grant a new trial pursuant to Federal Rules of Criminal Procedure 33.


Dated: White Plains, New York
        January 13, 2016


                                        Respectfully submitted,



                                        STEPHEN R. LEWIS, ESQ.
                                        Stephens, Baroni, Reilly & Lewis, LLP
                                        *Attorneys for Defendant, Wayne Charles*
                                        175 Main Street, Suite 800
                                        White Plains, New York 10601
                                        Telephone: (914) 683-5185

## CERTIFICATION OF SERVICE

**STEPHEN R. LEWIS**, an attorney duly admitted to practice law before the Courts of the United States, Southern District of New York, affirms the following under penalty of perjury:

That I am the attorney for Defendant, WAYNE CHARLES, in the above entitled action; that I am not a party to this action; and that on the 13th day of January, 2016, I served the annexed MOTION FOR JUDGMENT OF ACQUITTAL, by ECF upon the following:

UNITED STATES ATTORNEY'S OFFICE
Southern District of New York
Attention: AUSA Andrew Dember and
                    AUSA Daniel Filor
300 Quarropas Street
White Plains, New York 10601

Dated: White Plains, New York
            January 13, 2016

Stephen R. Lewis, Esq.