UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA                               **08 Cr. 243(KMK)**

v.

CONSTANCE G.POST  and
WAYNE CHARLES,
           Defendants.

**Government's Memorandum of Law In Opposition to
Defendants' Motions, Pursuant To Rules 29 And 33 Of The Federal
Rules Of Criminal Procedure For A Judgment Of Acquittal Or A New Trial**

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Andrew S. Dember
Daniel P. Filor
Assistant United States Attorneys
     *Of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

CONSTANCE G. POST and
WAYNE CHARLES,
　　　　　　　Defendants.

08 Cr. 243(KMK)

## Government's Memorandum of Law In Opposition
## To Defendants' Motions, Pursuant To Rules 29 and 33 Of The Federal
## Rules Of Criminal Procedure, For A Judgment Of Acquittal Or A New Trial

### Introduction

The Government respectfully submits this memorandum of law in opposition to the
defendants' post-trial motions for a judgment of acquittal, pursuant to Rule 29 of the Federal
Rules of Criminal Procedure, and for a new trial, pursuant to Rule 33 of the Federal Rules of
Criminal Procedure. Defendant Post moves for an acquittal or new trial claiming that (1) the
Government's remarks in its rebuttal summation attacked defense counsel "by claiming counsel
fabricated testimony" and deprived her of a fair trial; (2) the Government's remarks in its
summation that Charles's payment of $31,000 to Post was a bribe, gratuity, kickback or "thank
you" was not supported by the evidence; and (3) the Government's remarks in its rebuttal
summation about the defense's SEMAP scores evidence improperly shifted the burden of proof.
Defendant Charles moves for an acquittal or new trial claiming that (1) the Government's failed
to prove that he had the requisite intent to defraud or that he contemplated harm to the City of
Mount Vernon, its citizens, or the U.S. Department of Housing and Urban Development
("HUD"); (2) the Government's remarks in its rebuttal summation about the testimony of Joseph

Sparano concerning a defense exhibit were not supported by the evidence; and (3) the Government's remarks in its rebuttal summation regarding Charles double-billing Mount Vernon for $2,565 were improper. For the following reasons, the defendants' motions should be denied.

## Statement of Facts

Following a ten-week jury trial, that spanned almost seven months from May 5, 2015 to November 30, 2015, the defendants were convicted of conspiracy to commit mail fraud and substantive mail fraud. The charges arose out of their corrupt relationship in which Post, the Commissioner of the Mount Vernon Department of Planning and Community Development and the Executive Director of the Mount Vernon Urban Renewal Agency ("MVURA") assisted Charles, a businessman who owned investment properties in and did business with the City of Mount Vernon, in obtaining contracts and a $500,000 loan from the City of Mount Vernon. Charles was also found guilty following the first trial of this case in 2009 of making false statements to federal agents. He has not yet been sentenced on that conviction.

At trial, the Government presented overwhelming proof of the defendants' participation in a conspiracy and scheme to defraud the City of Mount Vernon and HUD of money and property. The proof showed that Post steered to Charles millions of dollars in contracts and benefits through acts of concealment and false statements. The evidence further established that in carrying out their scheme, both Post and Charles made numerous false and misleading statements to Mount Vernon city officials in order to induce the city to authorize the payment of HUD funds to Charles and companies owned by Charles. The monies obtained by fraud by Charles with Post's assistance came from a computer services contract that eventually paid Charles more than

$1 million and from a $500,000 loan. The evidence established that Post and Charles defrauded the City of Mount Vernon and HUD by, among other ways, (1) fraudulently inducing Mount Vernon to enter into contracts with an unqualified and fictitious computer services company secretly created by Charles who had no employees or experience in the field; (2) funneling unauthorized and excessive payments to Charles under the guise of existing contracts, which had restrictions that the defendants ignored; (3) causing Mount Vernon to use Section 8 funds improperly; (4) misrepresenting to decision making authorities the nature of the services being delivered by Charles; (5) creating phony documents, using fictitious names, and attesting to false facts in order to conceal their illicit scheme; (6) concealing the identity of companies controlled by Charles; and (7) concealing material facts critical to the awarding of contracts and a loan.

The money that funded the contract and the loan was HUD money entrusted to the MVURA, and subject to strict regulatory restrictions and controls. The proof showed that through an elaborate pattern of deceit, dependent upon Post's assistance from inside the halls of City government, the defendants manipulated the system to make it appear to decision makers that Charles's various businesses receiving Mount Vernon and HUD funds were legitimate operations entitled to receive such funds, when in truth and fact, they were not.

**Micros Only**

Post and Charles's fraud scheme started in 1998, when Charles submitted a proposal in the name of a company called Micros Only to the MVURA in order to obtain a computer services

contract from that agency.  (GX 102-D, GX 102-E).[1]  At that time, Charles did not have a computer services company, had no experience in the computer services field, and had no employees who could provide computer services.  To create the appearance that he had a legitimate, functioning company, Charles used the name of his friend Dante Brown's defunct computer services company – Micros Only – without Brown's knowledge or consent and falsely represented that his company had a history of clients, whose names he included in the proposal.  (Tr. 291-95; GX 102-E).  Charles concealed his involvement in this part of the scheme by signing Dante Brown's name to the proposal that he submitted to the MVURA and to the cover letter which accompanied the proposal.  (GX 102-D. GX 102-E).  Charles further concealed his connection to his Micros Only company, by providing a phony address, phony telephone number, and phony fax number on the proposal and cover letter that could not be traced back to either him or Dante Brown.  (*Id.*; Tr. 293-96, 1597-1603; DX P-EJ-A, DX P-EJ-B).

In steering the computer services contract to Charles, Post appeared before the MUVRA Board, whose authorization was required to award a MVURA contract or loan, and fraudulently represented that a Request for Proposal had been issued, that Micros Only was a qualified and the best bidder, and that the billing rate of $89 per hour to provide network support services was below the market rate.  (GX 102-A, GX 102I-1).  In truth and fact, there had been no public bidding on the computer services contract, that the real Micros Only had not submitted a bid for

---

[1] "GX" refers to a Government Exhibit at trial; "DX" refers to a Defense Exhibit at trial; "Tr." refers to the 2015 trial transcript; "[Name] Br." refers to named defendant's motions for a judgment of acquittal or new trial.

that contract, and the bid that Post endorsed was a sham document.[2] The evidence established that in fact Micros Only was a defunct company formerly owned by Charles's friend Dante Brown, was no longer in operation, and did not submit a bid for that contract. (Tr. 291, 307, 322-28).

After the MVURA Board awarded the contract to Micros Only on July 28, 1998, Post continued to conceal Charles's involvement by preparing a congratulatory letter notifying Charles of the Board's decision but addressing the letter to Dante Brown at the phony Micros Only address provided by Charles. Post then sent the letter by fax to Charles using a fax number that Charles used for his various businesses. (GX 515; Tr. 332-35).

After Charles's Micros Only company was awarded the contract, Charles abandoned the use of the name "Dante Brown," to conceal his involvement in the business, and started using the name "William Brown" in his dealings with the MVURA. (GX 500-O, GX 518, GX 532). The evidence established that Charles had previously used the name William Brown as an alias with respect to other matters and had received mail in that name. (Tr. 586, 3944-46). In August 1998, Charles signed the computer services contract with the MVURA using the name "William Brown," rather than his true name. (GX 518). After doing so, Charles signed the name "William Brown" to each of the 184 vouchers he submitted to the MVURA for payment over the course of the contract. (GX 200-GX 383).

---

[2] Post fraudulently represented to the MVURA Board that the only other bidder was Anthony Fusco. (GX 102, GX 102A-GX 102E). Fusco testified that he drafted a proposal to continue providing computer services to the MVURA, which he submitted before Charles' Micros Only proposal was submitted and, in fact, a redacted copy of Fusco's proposal was found in Charles' files. (Tr. 150-52; GX 53S, GX 102-C, GX 102-E, GX 510).

The proof, of course, established that Charles was the owner of Micros Only and that he controlled the more than $1 million that Micros Only was paid by the MVURA. (Tr. 5116-19; GX 400-A, GX 401-A thru GX 401-NN, GX 402-A, GX 402-B, GX 403, GX 404, GX 405 thru GX 495). In 1998, Charles deposited the first few MVURA checks made payable and issued to Micros Only into one of his personal bank accounts and used two of the checks to pay off his American Express credit card bill. (Tr. 5116-19; GX 400-A, GX 401-B, GX 401-S, GX 403, GX 404). In 1999, Charles incorporated an entity with a similar name -- Micros Only Computer Concepts, Inc. -- in the State of New York and had his sister, Susie Saahir open and maintain a checking account in that name, which Charles used to deposit the remainder of the MVURA checks made payable to Micros Only. (Tr. 691-97, 700-03, 715; GX 593, GX 593S, GX 2006). As the evidence established, while Saahir was the sole signatore on the account, all the disbursements made by her from the account were at Charles's direction. (Tr. 734-36, 743, 750, 759, 786, 808; GX 2006).

After the contract was awarded to Charles's Micros Only company, Charles brought Ernest Joseph and Dante Brown to two meetings with Constance Post at Mount Vernon City Hall in or about September and October 1998. (Tr. 1543-54). The purpose of the meetings was so Joseph could assess the MVURA's computer needs and recommend the type of computers the MVURA should purchase. (Tr. 1538-40). Charles did not tell Joseph that Charles's Micros Only company had already been awarded a computer services contract with the MVURA months before. (Tr. 1542-55). In requesting his assistance, Charles lied to Joseph and told him that they – meaning Charles, Joseph, and Brown -- were competing for a MVURA contract to install new

computers and perform ongoing computer maintenance against a number of other companies. (Tr. 1538-40, 1619-20).  Joseph submitted a proposal to Post in which he recommended that the MVURA purchase Dell computers, which it eventually did. (Tr. 1549-52, 1553; GX 104-A, GX 525).  Charles subsequently advised Joseph that they did not get the contract and blamed the failure to win the contract on Brown.  (Tr. 1554-55, 1620).

Because Charles did not have a computer services company or employees who could provide network support services, in or about November 1998, Post hired Michael Leigh, who had his own computer services company, to actually perform the work required under the contract.  (Tr. 1878-89).  Leigh was hired by Post but placed on the Micros Only payroll to help Charles steal money from the MVURA.  In or about November 1998, Leigh began the work under the contract, installing new computers and software.  (Tr. 1887-93).  Several weeks after he started work and after he had already submitted a number of his invoices to Ann May the MVURA Director of Finance, expecting to be paid by Mount Vernon, he was advised by May that he was required to provide his invoices to Micros Only which was responsible for paying him.  (Tr. 1901-04).

Charles billed the MVURA for Leigh's services at a rate far in excess of what Leigh individually billed.  While Leigh billed his services at $45 per hour throughout the course of the contract, Charles billed the MVURA for Leigh's work at rates ranging from $89 to $95 per hour, which allowed Charles to steal between $44 to $50 for each hour Leigh worked.  (Tr. 1894-95, 1897; GX 200-GX 383).

Leigh continued to provide network support services to the MVURA while being paid by Micros Only until about June 2002. (Tr. 1892-93). After the original contract was entered into, on Post's recommendations, the MVURA Board approved four separate extensions of the contract. (GX 105-A, GX 110-B, GX 112-A, GX 120-A). During the entire course of the contract, Michael Leigh was the only one actually providing network support services to the MVURA. (Tr. 1913). And the original contract and first three extensions authorized payments for network support services only. In July 1998, the Board approved the initial contract with Micros Only for network support services for the agency's computer systems at a rate of $89 per hour for 100 hours of work for a total of $8,900. (GX 102-A). In December 1998, the Board approved the first extension of the contract for "additional netware (sic) support services on an hourly rate basis of $89 per hour for a 225-hour block of time totaling $20,025.00." (GX 105-A). In March 1999, the Board approved a second extension to "provide netware (sic) support services of the Finance Department" including "consulting services, local area network equipment, software, and support services at a contract price of $14,500 for the initial, start-up phase" and "network maintenance, training and technical support, including troubleshooting at the hourly rate of $100 for a 100-hour block of time totaling $10,000," for a total of $24,500. (GX 110-B). In June 1999, the Board again authorized an extension of the Micros Only contract for "additional netware (sic) support services on an hourly basis of $89 per hour for a 300-hour block of time totaling $26,700." (GX 112-A).

Notwithstanding the spending limits placed on the original contract and the first three extensions by the MVURA Board, Post completely disregarded those restrictions and approved

payments to Micros Only and Charles that grossly exceeded those limits. (GX 200-GX 383; GX 30-F). From the start of the contract and up until December 2000, the MVURA Board had authorized Post to pay Micros Only a total of $80,125 under the original contract and first three extension. (Tr. 5119-22; GX 30-F). Post, who was responsible for ensuring that the contract was faithfully complied with, approved and caused the disbursement of more than $335,000 to Micros Only, approximately $250,000 more than was authorized.[3] (GX 30-F, GX 150).

In December 2000, Post once again went before the MVURA Board and recommended a fourth extension of the Micros Only contract, this time with no monetary limit. (GX 120-A). At that meeting, Post deliberately concealed from the Board the fact that, up until that point in time, she had approved the payment to Micros Only and Micros Only in fact had been paid approximately $250,000 more than the Board had authorized. (GX 120D-1).

At that time, Post also concealed from the Board that, months before, she had hired and paid under the Micros Only contract an accountant and data entry workers, even though the Board had only authorized payment for network support services.[4] In the fall of 1999, Post hired Yvonne Ross to do data entry work and paid her under the Micros Only contract at a rate of $50 per hour, an exorbitant rate agreed upon by Charles and Post.[5] (Tr. 1063; GX 200-GX 383).

_____

[3] The MVURA by-laws provide that the Executive Director was, among other things, "charged with the responsibility of causing the plans, orders, _directives_, rules and _contracts of the agency to be faithfully complied with, executed and performed._ *See* GX 150 at 2 (emphasis added).

[4] The trial evidence established that network support services consist of, among other things, installing and maintaining computer hardware and software, but do not include data entry work. (Tr. 1898-99).

[5] As the Government argued in its summation, a pay rate of $50 per hour translates into $400 per day for a person working an eight-hour day; $2,000 per week if that person worked five days per

Starting in the fall of 2000, Post also authorized payments to Micros Only for data entry work performed by Garrett White, Glenrick Rhooms, Donald Robinson, Jr., Vanessa Senior, and others at the MVURA, also at a rate of $50 per hour, even though the Board likewise had not authorized that work or pay rate. (GX 200-383). Because Charles paid Ross and Robinson $20 per hour and $15 per hour respectively, this allowed Charles to steal from the MVURA and HUD $30 for each hour Ross worked and $35 for each hour Robinson worked. (Tr. 1112-13, 1129, 1195, 2191).

In June 2000, Post hired Gary White, an accountant who initially did accounting work for the MVURA through a temp agency, and placed him on the Micros Only payroll so that Charles could steal even more money. (Tr. 3726-27, 3731-32). Post advised White that he would be paid through Micros Only and after he agreed to that arrangement, he either called or received a telephone call from a person who in all likelihood was Charles. (Tr. 3732-34). During their brief conversation, they discussed White's pay and agreed that he would be paid $33 per hour.[6] (Tr. 3734). Charles then billed the MVURA at a rate of $70 per hour for White's work, a rate agreed upon by Charles and Post, allowing Charles to steal $37 for each hour White worked. (GX 218, GX 221, GX 223, GX 233). White was subsequently instructed to describe his work on his invoices/timesheets as "computer accounting consultant." (Tr. 3750-51).

---

week; and $100,000 per year if the person worked 50 weeks per year. This obscenely exorbitant rate of pay was intended to allow Charles to steal substantial amounts of money from Mount Vernon and the MVURA. By way of comparison, Post, who as Executive Director was the highest ranking official in the MVURA, earned an annual salary of $102,831 in 2004. (GX 15).

[6] White testified that he never knowingly spoke with or met Wayne Charles. (Tr. 3734-35).

During the December 2000 MVURA Board meeting, Post also deceived the Board into authorizing, for the first time, payments to Charles's Micros Only company for "computer accounting" services at $70 per hour and "data entry services" at $50 per hour, services and rates of pay she was already paying without the Board's approval. (GX 120-A). As described above, prior to the December 2000 MVURA Board meeting, the Board had never authorized the MVURA to pay Micros Only for data entry work, "computer accounting," or any kind of accounting work. Without the authority to do so, Post had taken it upon herself to pay Micros Only for those services under the contract at rates never authorized by the Board. (GX 200-383).

As the evidence established, there was virtually no discussion by members of the Board about the fourth extension. The extension, which covered the 2001 program year (January 1, 2001 through December 31, 2001) and had no monetary limits, was unanimously approved. (GX 120D-1). In the actual resolution authorizing the fourth extension, Post added the following deceptive paragraph:

> ". . . after solicitation of proposals by the Agency, Resolution No. 98-67 on July 28, 1998 authorized the Agency to purchase netware (sic) support services from Micros Only at the following cost per hour: Technical Support Services at $95.00 per hour, Computer Accounting Services at $70.00 per hour, Data Entry Services at $50.00 per hour and Other Support Services at $40 per hour …"

(GX 120-A). In fact, the July 28, 1998 Resolution No. 98-67 made no mention of "computer accounting services" or "data entry services" and only authorized payment for network support services at $89 per hour, (GX 102-A). The resolutions for the first three extensions likewise made no mention at all of "computer accounting services" or "data entry services." (GX 105-A, GX 110-B, GX 112-A). The only work authorized was the network support work actually

performed by Michael Leigh. *Id.* During the 2001 program year, which ran from January 1, 2001 through December 31, 2001, the MVURA paid Micros Only more than $635,000. (GX 30-F).

Post and Charles found yet another way to steal HUD funds and enrich Charles in 2001. For a three-month period, between March and June, Post assigned Ross to the Management Services Department to do data entry in that agency. (Tr. 1138-58, 3948-52; GXs 276, 281, 288, 293, 295, 301, 308, 315). In that agency, Ross entered information from parking tickets into the city computer system. Employees working in that department were paid from the city budget, while employees and contract workers in the MVURA were paid with HUD funds by the MVURA. (Tr. 3952-56). During the three months Ross worked in the Management Services, she was paid through Micros Only with HUD funds. (GXs 276, 281, 288, 293, 295, 301, 308, 315). During that time, Charles billed the MVURA for Ross's work at the extraordinary rate of $70 per hour (rather than the exorbitant rate of $50 per hours he billed when she worked in the MVURA), a rate agreed upon with Post but not authorized by the MVURA Board, allowing Charles to steal $50 for each hour Ross worked in that department. *Id.*[7]

After the 2001 program year ended on December 31, 2001, Post continued to help Charles steal HUD funds. Despite the fact that the MVURA Board never extended the Micros Only

---

[7] Ross worked with the employee in the Management Services Department who was responsible for entering information from parking tickets into the city computer system. That person was a full-time Mount Vernon employee who was paid on an hourly basis and made less than $30,000 per year. (Tr. 3950-56). A full-time employee working 8 hours per day, 5 days per week, and 50 weeks per year, at a rate of $70 per hour (the rate Charles billed the MVURA for Ross's time), would make $140,000 per year.

contract beyond December 31, 2001, Post continued to employ Micros Only and help Charles steal more than $110,000 in 2002, none of which had been authorized by the Board. (GXs 353-383). Indeed, Post did not even request an extension of the Micros Only contract into the 2002 program year until March 19, 2002, having already paid Micros Only for services rendered in January, February, and the first half of March of 2002 without authorization from the Board. (GX 130-A, GXs 353-383). On March 19, 2002, Post went before the Board to request yet another extension of the Micros Only contract. During that meeting Post was asked how much the Micros Only had been paid in the previous year. (GX 130C-1). She lied and told the Board members that the MVURA had paid Micros Only either $50,000 or $150,000 in 2001 (the audibility of the recording of that meeting was not clear), when in fact, Micros Only had been paid more than $635,000 in 2001 alone (and more than $1million since the start of the contract in 1998). (GX 30-H, GX 130C-1). The Board declined to grant Post's request for another extension. (GX 130-B, GX 130C-1).

And even though the Board explicitly denied Post's request for an extension on March 19, Post disregarded that decision and continued to pay Micros Only and Charles for the work done by Michael Leigh and Gary White from March until June 2002, helping Charles steal even more HUD money. (GXs 372, 375-383).[8]

---

[8] In January 2003, Post hired back both Michael Leigh and Gary White to do the same work in the MVURA they had done while being paid by the Micros Only. Leigh was paid $60 per hour and White was paid $33 per hour. (Tr. 1928-35, 3761; GX 15).

**The "Thornton Meacham" letter**

In a last ditch effort to steal even more money under the Micros Only contract, in May 2003, long after that contract had expired, Charles drafted and mailed a fraudulent letter to the MVURA seeking yet additional payments under that contract. The letter claimed that invoices reflecting work done by Michael Leigh in 2002 and 2003 had not been paid. Charles drafted the letter on what appeared to be an attorney's stationary and forged the signature of an attorney named Thornton Meacham on the letter. (Tr. 4837-40; GX 590, GX 590-B). There was no evidence that Charles or Micros Only was paid as a result of this letter.

**The $500,000 Loan**

While the Micros Only part of their scheme was ongoing, Post assisted Charles in obtaining from the MVURA a $500,000 loan by fraud. In documents submitted with his application for this loan, Charles made material false statements to the MVURA. When asked in two documents whether he or anyone in his company served as a "consultant" for Mount Vernon or the MVURA, Charles lied and responded "no" to those questions even though he knew that he was the computer consultant for the MVURA under the Micros Only contract. (GX 1072). Charles, of course, did this to conceal his involvement with Micros Only because he had fraudulently obtained the contract and he and Post were using that contract as a vehicle to steal from Mt Vernon and HUD. When asked in another document whether he was known by any other names, Charles lied again and responded "no" to that question even though he and Post knew full well that he was concealing his involvement as the principal of his Micros Only

company by using the names "Dante Brown" and "William Brown." (GX 1070-A). Charles answered this question falsely for the very same reason.

After fraudulently obtaining the $500,000 loan with Post's help, Charles, also with Post's assistance, never paid the $250,000 that he owed to the MVURA after the Community Preservation Corporation ("CPC") paid off one-half of the loan. Post, who was well aware of Charles's loan, concealed its existence from the persons responsible for keeping track of it and collecting payments on it. (Tr. 2525-38; GX 1068, GX 1230). As the evidence established, the loan was one of the largest ever made by the MVURA and was the first loan provided to a private developer renovating a building as part of the Third Street Corridor Initiative, an important program initiated by the then-mayor of Mount Vernon. (Tr. 2422, 3058). And, of course, it was a loan provided to a person with whom Post had both a romantic and business relationship. Post was also aware that starting in October 2003, Charles was supposed to start making monthly payment of $1,500 on the loan. She also knew that the loan did not appear on lists periodically provided to her by Nashon Halevi, Gary White, and Scott Oling and for nearly a two-year period, she never directed them to add Charles's loan to their lists. (Tr. 3765-78, 3876-77, 3902-06; GX 1387-A, GX 1387-B, GX 8002). It was not until May 2005, when HUD auditors were present at the MVURA that she finally directed Nashon Halevi and Gary White to put the loan "on the books" and to start collecting payments on the loan. (Tr. 3780-85, 3882-86). Charles still owed $250,000 in 2010 when he sold 3 East 3rd Street and the new owner assumed Charles's $250,000 debt to the MVURA based on that loan.

**Wayne Charles's Statements to the HUD Agents**

In 2005, Special Agents William Martinez and Stephen Huvane, from HUD's Office of the Inspector General, started the criminal investigation that ultimately resulted in the charges in this case. In March 2006, Martinez and Huvane interviewed Charles in the presence of his then attorneys in the attorneys' offices in Mount Vernon. (Tr. 4816, 4820-38). During the course of the interview, in order to conceal his criminal conduct, particularly his theft of HUD funds through the Micros Only contract, Charles made numerous false statements to the agents. When Charles was asked about his business dealings with the City of Mount Vernon, he told the agents that he was the recipient of a $500,000 rehabilitation loan and that he was a Section 8 landlord. (Tr. 4826). He made no mention of his Micros Only company. When asked about Micros Only, Charles falsely stated that he had heard of the company but that he had no interest in the company. (Tr. 4827). Charles was directly asked whether in fact he was the owner of Micros Only. He denied being the owner and told the agents that the principal owners were William Brown and Blanche Brown.[9] When the agents asked Charles how they could contact William Brown, Charles told them that William Brown had died "a long time ago," "decades ago." (Tr. 4830). The agents showed Charles a number of Micros Only vouchers which had been submitted for payment and paid by the MVURA with what was supposedly the signature of a

---

[9] Susie Saahir, Charles's sister, testified that Blanche Brown was their mother's name and that she passed away in 2005. (Tr. 846, 850, 934, 935). She also testified that her mother had no involvement with Charles's Micros Only company. (GX 852). There were no checks payable to Blanche Brown from the Micros Only Computer Concepts bank account. (*See* GX 2006). Dante Brown testified that neither William Brown nor Blanche Brown had any role in his Micros Only company. (Tr. 321-22).

"William Brown" and asked him who signed the name "William Brown" on the vouchers if Brown had died "decades ago"?  Charles responded that Blanche Brown signed the vouchers. (Tr. 4830).  The agents then stated to Charles that the "William Brown" signature appeared to resemble Charles's handwriting.  The agents had seen Charles's signature on the driver's license he showed them at the beginning of the interview.  Charles responded by saying that the "William Brown" signature on the vouchers "might be" his writing.  (Tr. 4831-32).  When asked if he had any affiliation with Micros Only, Charles stated that he was not the owner but that he was thinking of going into business with the company and was "trying to help them out."  (Tr. 4827).  Charles also told the agents that the company Micros Only was a tenant in his brownstone at 168 West 130th Street.  (Tr. 4827-28).

During the interview, Charles also told the agents that he recruited a few people for Micros Only.  He falsely claimed that he recruited Michael Leigh and Gary White, although when asked, he could not remember how he had recruited White. (Tr. 4828).  The trial evidence, of course, proved that he had not recruited either Leigh or White and that, in fact, Post had "recruited" and hired them.  Charles also told the agents that he had tried to recruit two people from Boston, including a person named Yigal.[10]  Charles stated that he could not remember the name of the second person from Boston.  (Tr. 4828).  Charles also told the agents that he assisted Micros Only by informing Blanche Brown that he had heard from a person in the MVURA that they

---

[10] The "Yigal" that Charles was apparently referring to was Yigal Joseph, who was not recruited from Boston, but worked for the New York City Board of Education in the Bronx with Charles's friend Yvonne Young.  Charles set up two meetings between Post and Joseph and for a short period of time used Joseph as the "face of Micros Only" in Mount Vernon City Hall. (Tr. 1641-62).

needed computer support services for Y2K and payroll issues and that she should write a letter to Ann May describing what Micros Only could do for the MVURA.  (Tr. 4829).

Toward the end of the interview, Charles's attorneys asked the agents to leave the room that they were using so that they could speak with Charles in private.  The agents complied with the request and about ten minutes later were invited back into the room.  (Tr. 4832-33).  When the agents returned to the room, Charles stated that "Dante Brown did exist, but he walked away from the company."  (Tr. 4833).  Neither the agents nor Charles's attorneys, in the agents' presence, had asked or said anything to Charles to elicit that statement about Dante Brown.  (Tr. 4833-34).  At no time during the interview did Charles tell the agents that Dante Brown was the owner of Micros Only.  (Tr. 4834).  Charles's statement about Dante Brown was one of the few truthful things he told the agents that day.  As Brown testified, he did "walk away" from his company Micros Only in or about 1998 when he became the Executive Director of the Harlem Junior Tennis Program. (Tr. 291-92, 307).

Finally, the agents showed Charles a letter dated May 2, 2003, which was addressed to Constance Post and had been mailed to the MVURA.  The letter purportedly had been written by an attorney named Thornton Meacham on behalf of Micros Only regarding monies supposedly still owed to Michael Leigh by the MVURA under the Micros Only contract.  (Tr. 4837-40; GX 590, GX 590-B).   First, the agents asked Charles if he knew Mr. Meacham and he stated that he did.  (Tr. 4838).  The agents then told Charles that they had spoken with Meacham and were told by him that the letterhead and signature on the letter were not Meacham's.  Charles acknowledged that he knew that the signature on the letter was not Meacham's.  (Tr. 4838).

## Argument

## Point I

## The Evidence of Charles's Intent to Defraud Was Overwhelming

Charles first argues that the Government failed to prove that Charles intended to defraud the City of Mount Vernon or HUD or that he contemplated some actual harm or injury to those entities. Charles Br. 5-7. This claim is meritless. The evidence amply established that Charles and Post intended to defraud and, in fact, did defraud the City of Mount Vernon and HUD and that the scheme to defraud did in fact cause actual harm and injury, that being the theft of hundreds of thousands of dollars of HUD funds.

**Applicable Law:**

Under Federal Rule of Criminal Procedure 29(a), at the conclusion of the Government's case-in-chief or after the close of all the evidence, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed.R.Crim P. 29(a). When a court reserves decision on a Rule 29(a) motion, as the Court did here, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." *United States* v. *Truman*, 688 F.3d 129, 139 (2d Cir. 2012) (quoting Fed. R. Crim. P. 29(b)). Both Post and Charles renewed their Rule 29 motions on both counts at the close of the defense cases, pursuant to Rule 29(c). "Motions under Rule 29(c) are governed by the same standard as motions under Rule 29(a)." *United States* v. *Martinez*, 978 F.Supp.2d 177, 185 (E.D.N.Y. 2013). However, on a Rule 29(c) motion, the Court may consider all of the trial evidence and not only the evidence introduced during the Government's case-in-chief.

"In considering a Rule 29 motion, the Court must determine whether, 'after viewing the evidence in light most favorable to the prosecution, . . . any rational trier of fact could [find] the essential elements of the crime beyond a reasonable doubt.'" *United States* v. *Choullam*, 2008 WL 3861356, at *1(S.D.N.Y. Aug. 19, 2008) (citations omitted). Under Rule 29, the critical question "is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States* v. *Downing*, 297 F.3d 52, 56 (2d Cir. 2002) (quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in *Jackson*). "A defendant challenging the sufficiency of the evidence bears a heavy burden." *United States* v. *Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). In evaluating a sufficiency challenge, the Court "'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'" *United States* v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012) (quoting *United States* v. *Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)). "Viewing the evidence in the light most favorable to the government means . . . recognizing that the government's evidence need not exclude every other possible hypothesis[.] *United States* v. *Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (internal quotation marks and citations omitted). The Court must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," and "may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States* v. *Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks and citation omitted). Rule 29(c) "does

not provide the trial court with an opportunity to 'substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury. *United States* v. *Guadagna*, 183 F.3d at 129 (quoting *United States* v. *Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)).

The credibility of a testifying witness is particularly within the province of the jury, not that of a reviewing court. *See United States* v. *O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("the jury and not the court [must] determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his [or her] testimony") (internal quotation marks and citations omitted). When a court reserves decision on a motion, under Rule 29(b), it must decide the motion on the basis of the evidence at the time the ruling was reserved, which here was at the close of the Government's case, but under Rule 29(c), the Court may consider the defense case. *United States* v. *Roldan-Zapata*, 916 F.2d 795, 803 (2d Cir. 1990).

On a Rule 29 motion, "[w]here . . . the issue is one of intent, the question is whether 'the inferences [in favor of the Government] are sufficiently supported to permit a rational juror to find that th[is] element, like all elements, is established beyond a reasonable doubt.'" *United States* v. *Workman*, 80 F.3d 688, 699 (2d Cir. 1996) (quoting *United States* v. *Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). "A conspiracy conviction cannot be sustained unless the government established beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute." *United States* v. *Hassan*, 578 F.3d 108, 123 (2d Cir. 2008). A conviction for a substantive mail fraud violation cannot be sustained unless the government has proven

beyond a reasonable doubt that the defendants acted with the intent to defraud. *United States* v. *Dinome*, 86 F.3d 277, 283 (2d Cir. 1996). To establish an intent to defraud, the Government need not prove that the scheme to defraud caused actual harm, but it must "prove that defendants contemplated some actual harm or injury to their victims. Only a showing of intended harm will satisfy the element of fraudulent intent." *United States* v. *Starr*, 816 F.2d 94, 98 (2d Cir. 1987); *see also United States* v. *Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991) ("It need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim.").

Fraudulent intent need not be proved by direct evidence. "The law has long recognized that criminal intent may be proved by circumstantial evidence alone." *United States* v. *Heras*, 609 F.3d 101, 106 (2d Cir. 2010). Indeed, "as a general rule most evidence of intent is circumstantial." *United States* v. *Salameh*, 152 F.3d 88, 143 (2d Cir. 1998). As a general matter, "[j]uries are free to choose any one of a host of reasonable interpretations in inferring criminal intent." *United States* v. *Brown*, 937 F.2d 32, 37 (2d Cir. 1991).

**Discussion:**

There was ample evidence from which the jury could conclude that Charles intended that the City of Mount Vernon and HUD would suffer harm by awarding a computer services contract to his Micros Only company and lending him $500,000. Indeed, viewed in its totality and in the light most favorable to the Government, the uncontroverted evidence that Charles (1) lied to the MVURA in his fraudulent proposal by using the name of a defunct company and claiming a history of clients, (2) concealed his true identity by using the names "Dante Brown" and

"William Brown" during the pendency of the computer contract, (3) used the contract as a vehicle to steal money from the MVURA and HUD by using inflated prices and charging for services that were not authorized, and (4) made false representations to the MVURA Board in order to obtain the $500,000 loan and never paid back $250,000 of the loan, provided a sufficient basis for the jury to find that he intended to defraud the City of Mount Vernon and HUD.

The entirety of Charles's dealings with the MVURA with respect to the computer services contract was fraudulent. As described above, Charles created a fraudulent proposal in which he falsely claimed to be Dante Brown, to own a computer services company named Micros Only, and to have provided computer services to a number of identified prior clients. After being awarded the contract, he used aliases and systematically charged the MVURA and was paid for services provided which were far beyond the monetary limits placed on the original contract and its first three extensions by the MVURA Board thereby stealing from that agency and HUD. Charles also charged for and was paid for services which were not authorized under the original contract or the first three extensions at exorbitant rates to further enrich him. Even after the contract expired and efforts to once again extend it were rejected by the Board, he, with Post's assistance, continued to be paid for services which were no longer authorized.

Charles's fraudulent intent may be proven by circumstantial evidence, "including by showing that the defendant made misrepresentations to the victim with knowledge that the statements were false." *United States* v. *Guadagna*, 183 F.3d at 129 (citing *United States* v. *Smith*, 133 F.3d 737, 743 (10th Cir. 1997). Here, the evidence clearly established that Charles knew full well that the numerous statements he made to the MVURA about the computer services contract and the

loan were false and were meant to deceive in order to steal HUD money. Furthermore, given the ample evidence that the very purpose of the scheme was to steal money from the MVURA and HUD, the jury could logically conclude that Charles's intent was in fact to defraud and cause financial injury. *United States* v. *Guadagna*, 183 F.3d at 129 ("When the necessary result of the . . . scheme is to injure others, fraudulent intent may be inferred from the scheme itself.").

## Point II

### The Government's Summations Did Not Deprive the Defendants of a Fair Trial

Both Post and Charles move for a new trial under Federal Criminal Procedure Rule 33, arguing that they were unfairly prejudiced by remarks made by the Government during its summations. Under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. The decision as to whether to grant a motion for a new trial is "firmly within the discretion of the trial judge" and "[i]n deciding whether to grant a Rule 33 motion, a judge may weigh the evidence and determine the credibility of witnesses" and "is not required to view the evidence in the light most favorable to the Government." *United States* v. *Tarantino*, 2012 WL 5430865, at *2 (E.D.N.Y. Nov. 7, 2012). "Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, where the truth of the prosecution's evidence must be assumed, . . . that discretion should be exercised sparingly." *United States* v. *Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). Motions for a new trial pursuant to Rule 33 "are disfavored in this Circuit" and "should be granted only in the most extraordinary circumstances." *United States* v. *Figueroa*, 421 F. Appx. 23, 24 (2d Cir. 2011). "'The ultimate

test [on a Rule 33 motion] is whether letting a guilty verdict stand would be a manifest injustice.' To grant the motion, '[t]here must be a real concern that an innocent person may have been convicted.'" *United States* v. *Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).

**Applicable Law:**

The Second Circuit has repeatedly cautioned that it is "a rare case in which improper comments" in a Government summation "are so prejudicial that a new trial is required." *United States* v. *Ferguson*, F.3d (2d Cir. 2011) (internal quotation marks omitted); *accord United States* v. *Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992). Among other things, "[t]he law has long recognized that summations -- and particularly rebuttal summations – are not detached expositions, with every word carefully constructed before the event.' *United States* v. *Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (internal quotation marks, citations, and alterations omitted). "Precisely because such arguments frequently require improvisation," the Second Circuit has said that it "will not lightly infer that every remark is intended to carry its most dangerous meaning." *Id.* (internal quotation marks and citations omitted). Moreover, under the "invited response" doctrine," defense argument may, in a proper case, 'open the door' to otherwise inadmissible prosecution rebuttal,' because prosecutors must be allowed to offer "legitimate responses" to defense arguments raised during summation. *United States* v. *Rivera*, 971 F.2d 876,883 (2d Cir. 1992).

Accordingly, a defendant asserting that a prosecutor's remarks warrant reversal "face[s] a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right to a fair trial." *United States* v. *Loscasio*, 6 F.3d 924, 945 (2d Cir. 1993);

25

*see also United States* v. *Rahman*, 189 F.3d 88, 140 (2d Cir. 1999). "Determination of whether there should be a reversal [for prosecutorial misconduct] requires an evaluation of the severity of the misconduct, the curative measures taken, and the certainty of conviction absent the misconduct." *United States* v. *Rosa*, 17 F.3d 1531, 1549 (2d Cir. 1994); *see also United States* v. *Spinelli*, 551 F.3d 159, 170 (2d Cir. 2008); United *States* v. *Elias*, 285 F.3d 183, 190 (2d Cir.), *cert. denied*, 537 U.S. 988 (2002). In making this determination, the Court "must consider the objectionable remarks within the context of the entire trial," *United States* v. *Espinal*, 981 F.2d 664, 666 (2d Cir. 1992), reversing only if the remarks, "viewed against the 'entire argument before the jury,' deprived the defendant of a fair trial." *United States* v. *Pena*, 793 F.2d 486, 490 (2d Cir. 1986) (citations omitted). Such a finding is generally made only on the basis of repeated improper statements by the prosecutor, not on merely a few isolated transgressions. *See, e.g., United States* v. *Shareef*, 190 F.3d 71, 78 (2d Cir. 1999); *United States* v. *Evangelista*, 122 F.3d 112, 120 (2d Cir. 1997). Indeed, "[e]ven where the prosecutor's argument was clearly impermissible, [the Second Circuit has] been reluctant to reverse where the transgression was isolated, the trial court took swift and clear steps to correct the implication of the argument, and the evidence against the defendant was strong." *United States* v. *Parker*, 903 F.2d 91, 98 (2d Cir. 1990). A defendant is entitled to relief only if he can show "that the comment, when viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudiced him." *Farhane*, 634 F.3d at 167 (internal quotation marks and citations omitted).

It is well settled that "'[t]he government has broad latitude in the inferences it may reasonable suggest to the jury during summation.'" *United States* v. *Zackson*, 12 F.3d 1178, 1183 (2d Cirl 1993) (quoting *United States* v. *Casamento*, 887 F.2d 1141, 1189 (2d Cir. 1989)). Thus, "[i]t is a 'rare case' in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required." *United States* v. *Rodriquez*, 968 F.2d 130, 142 (2d Cir. 1992). It is equally well settled that a "'prosecutor is entitled to comment on a defendant's failure to call witnesses to contradict the factual character of the government's case.'" *United States* v. *Caccia*, 122 F.3d 136, 140 (2d Cir. 1997) (quoting *United States* v. *Bubar*, 567 F.2d 192, 199 (2d Cir. 1977)). Moreover, the Second Circuit has long held that "the government may comment on a defendant's failure to call witnesses to support his factual theories." *United States* v. *Bautista*, 23 F.3d 726, 733 (2d Cir. 1994); *see also United States* v. *McDermott*, 918 F.2d 319, 327 (2d Cir. 1990); *United States* v. *Gotchis*, 803 F.2d 74, 80-81 (2d Cir. 1986). "The Government may not, however, go further and suggest that the defendant has the burden of producing evidence." *United States* v. *Bautista*, 23 F.3d at 733. In addition, the Government may not infringe upon a defendant's Fifth Amendment rights by referring to a defendant's failure to produce evidence when "'the defendant alone has the information to contradict the government evidence referred to or the jury naturally and necessarily would interpret the summation as a comment on the failure of the accused to testify.'" *United States* v. *Caccia*, 122 F.3d at 140 (quoting *United States* v. *Bubar*, 567 F.2d at 199).

Applying these principles here, Post's and Charles's arguments must be rejected. Considering the challenged remarks in the context of the trial as a whole, as this Court must, and

mindful of defense counsel's own summations, it cannot be said that the Government crossed the line, let alone crossed it far enough to warrant an new trial. Indeed, the Second Circuit has repeatedly declined to reverse in cases where prosecutors used much stronger rhetoric than that used in this case. *See, e.g., United States* v. *Beridze*, 415 F.ed. Appx. 320, 327 (2d Cir. 2011) (prosecutor called defense counsel's arguments "side shows and "red herring[s]" during rebuttal summation); *United States* v. *Millar*, 79 F.3d 338, 343-44 (2d Cir. 1996) (prosecutor described the defense as "hogwash" and a "smokescreen"); *United States* v. *Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995) (prosecutor called the defense a "fairy tale"); *United States* v. *Myerson*, 18 F.3d 153, 162-63 & n.13 (2d Cir. 1994) (prosecutor stated that the *pro se* defendant had engaged in "lawyers' tricks" and "play[ed] with the facts"); *United States* v. *Rivera*, 971 F2d at 883 (prosecutor characterized the defendant's case as "smoke screens, game-playing, distractions, and distortions"); *United States* v. *Resto*, 824 F.2d 210, 212 (2d Cir. 1987) (prosecutor referred to defense tactics as "slick bits," "slyness," and "sleigh-of-hand"); *United States* v. *Caputo*, 808 F.2d 963, 968 (2d Cir. 1987) (prosecutor implied in rebuttal that the defense was "playing fast and loose with the record in this case" and characterized part of defense counsel's argument as 'just one example of the numerous misrepresentations and sheer inventions that [defense counsel] put into his summation"); *United States* v. *Marrale*, 695 F.2d 658, 666-67 & n.9 (2d Cir. 1982) (prosecutor characterized the defense as "woven out of the thread of desperation" and repeatedly warned the jury not to be fooled by defense counsel's tactics); *United States* v. *Perry*, 643 F.2d 38, 51 (2d Cir. 1981) (prosecutor described defense counsel's attack as a "desperate" and "struggling" tactic).

### A. Defendant Post's claims

### 1. Yvonne Ross's Testimony

Post argues first that in its rebuttal summation, the Government attacked defense counsel "by claiming in so many words, that defense counsel made things up, i.e. fabricated evidence out of thin air[.]" Post Br. 4. Specifically Post refers to the part of the rebuttal summation in which the Government challenged the factual assertions made by counsel in Post's summation about the trial testimony of Yvonne Ross. Post argued that during an encounter between Yvonne Ross and Charles, Charles told Ross to call Dante Brown and that Ross then called Dante Brown. (Tr. 5467). There was no such testimony or evidence in the trial record.

**Relevant Facts:**

As the Court will recall, Yvonne Ross, who was called as a Government witness in its direct case, testified that she was a Micros Only worker who did data entry work in the Mount Vernon City Hall from the end of 1999 until 2002. (Tr. 1063). Ross testified that she first learned about the job while speaking with Wayne Charles, who was a friend of hers, at a bar in Harlem. (Tr. 1060-61, 1063-64). According to her testimony, Charles told Ross, who was unemployed and looking for work, that Dante Brown could help her get a data entry job in Mount Vernon. (Tr. 1063-69). Ross testified that she could not recall how she actually obtained the job, although she recalled at some point traveling to Mount Vernon and speaking with a number of people, including Post. She professed that she had no recollection of what transpired between the day she spoke with Charles at the bar and the day she first went to Mount Vernon City Hall. (Tr. 1072-77).

Ross testified that at some point, she started working in Mount Vernon City Hall, although she conceded that at first, she was not given any work to do for a period of approximately four to six weeks. (Tr. 1109).[11]  After starting in Mount Vernon City Hall, Ross testified that she spoke with Charles about the fact that she was not given any work to do. (Tr. 1110).  Ross also testified that after starting in Mount Vernon but before receiving a paycheck from Micros Only, she spoke with Charles about her need for money so that she could commute to Mount Vernon for the job and that Charles provided her with money. (Tr. 1110-11, 1115-21).  Ross testified that she contacted Charles about money after she was not able to reach Dante Brown.  (Tr. 1118-21).

Sometime after she started working in Mount Vernon City Hall, Ross testified that she ran into Dante Brown at a club in Harlem called the Flash Inn and thanked him for the job.  Brown responded by telling her not to "f___ it up."  (Tr. 1161-63).

On cross-examination, Ross testified that she "believed" that while doing data entry in Mount Vernon, she was "working for Dante Brown."  (Tr. 1167).  She also testified that "it was [her] belief" that Dante Brown owned Micros Only.  (Tr. 1214).

On redirect examination, Ross testified that she believed that Brown was in charge of Micros Only because she remembered him talking about the company "way before" her initial conversation with Charles about the job in Mount Vernon.  (Tr. 1228).  She also testified that that after her initial conversation with Charles about the  job, the only conversation she ever had with Brown about the Micros Only job was the brief exchange in which she thanked him for the

---

[11]  Although Ross did no work for the first four to six weeks she was in Mount Vernon, she, nevertheless, was paid for each day she was there.  (Tr. 1111).

job and Brown told her not to "f__ it up." (Tr. 1228-29). Finally, she testified that her belief that Brown got her the Micros Only job was based on the fact that he owned Micros Only and that Charles and Brown were "like brothers, so I didn't question it." (Tr. 1230). Ross testified that she believed that Charles and Brown "were together with Micros Only," but acknowledged that she did not know what Micros Only did to get her the job in Mount Vernon. (Tr. 1232).

During Post's summation, counsel argued to the jury, based in part on Ross's testimony, that Dante Brown, and not Wayne Charles, was Micros Only. (Tr. 5466). In support of that claim, Post's counsel argued the following to the jury:

> In fact, she [Ross] ran into Wayne Charles at a bar. She said she was unemployed. She was looking for work. Remember? And what did Wayne Charles allegedly say to her? <u>Call Dante. He's got a computer company. She calls Dante. She comes in. She gets the job.</u>

Tr. 5467 (emphasis added).

In its rebuttal summation, the Government disputed Post's rendition of Ross's testimony and argued the following:

> Mr. Tanner tells you that Wayne Charles told her [Ross] to call Dante Brown. Well, Ms. Ross never said that, Ms. Ross never said that Wayne Charles told her to call Dante Brown. Mr. Tanner then said that Ms. Ross called Dante Brown. She never said that either. That's just made up. That's just made up.

(Tr. 5623-24).

**Discussion:**

Post now claims that the Government deprived her of a fair trial by attacking her counsel by "claiming in so many words, that defense counsel made things up, i.e. fabricated evidence out of thin air." Post Br. 4. Post also claims that the Government's rebuttal argument was "meant as a

personal attack on defense counsel's credibility." Post Br. 5. Post is wrong and her claims are baseless.

In the first instance, a review of the trial record, as described above, establishes that in fact defense counsel misrepresented the testimony of Ross. Ross never testified, as Post's counsel claimed, that Charles directed her to call Dante Brown to obtain the Micros Only position. Similarly, Ross never testified that she called Brown to speak about the position. Indeed, as Ross testified, the only conversation she ever had with Brown concerning the Micros Only position took place after she had started working in Mount Vernon, when saw him in a bar and thanked him for job. Given the inaccuracy of Post's rendition of Ross's testimony on the subject, the complained of remarks were fair comment.

Furthermore, the Government 's use of the words "made up" were not intended as a personal attack on defense counsel or his credibility, but used to emphasize the weakness in Post's factual assertions and argument that Brown hired Ross. Post's claim to the contrary is not supported by the trial record. As the Second Circuit has instructed, in accessing arguments in a rebuttal summation, courts should "not lightly infer that every remark is intended to carry its most dangerous meaning." *Donnelly* v. *DeChristoforo*, 416 U.S. at 646-47; *United States* v. *Farhane*, 634 F.3d at 167. The remarks here amounted to nothing more than a legitimate "attempt to focus the jury's attention upon the evidence and away from counsel's claims." *United States* v. *Williams*, 690 F.3d 70, 76 (2d Cir. 2012); *United States* v. *Rivera*, 971 F.2d 876, 883 (2d Cir. 1992). Indeed, to the extent that one could even consider the brief remarks objectionable, they were a far cry from the sort of sustained attack on the integrity of defense counsel that the

Second Circuit has held to be reversible error.  *See United States* v. *Friedman*, 909 F2d 705, 708

(2d Cir. 1990).

### 2.  The SEMAP Scores

Post next claims that the Government shifted the burden of proof in its rebuttal summation by

commenting on the quality of evidence presented in the defense case with respect to the SEMAP

scores attributable to the Section 8 department of the MVURA.  The Government's remarks did

not shift the burden of proof and were fair comment in response to Post's argument in

summation.

**Relevant Facts:**

Post claimed in summation that the evidence showed that Post had no intent to deprive the

City of Mount Vernon or HUD of money or property and that her intent was solely to manage

the MVURA effectively.  She essentially argued in summation that the hiring of Micros Only

and the concurrent improvement of the Section 8 Department's SEMAP scores reflected that

intent.

In response to that claim, the Government argued in rebuttal the following:

> Now counsel has made a big point about . . . SEMAP scores.  And you might ask
> yourselves, . . . SEMAP scores, what do SEMAP scores have to do with this case?  Well,
> I can give you the long version or the short version answer to that.  The short version
> first. . .  Absolutely nothing.  Absolutely nothing.

> Now, keep in mind, defense has absolutely no burden of proof.   The Judge has said to
> you many times, he'll say to you again in his charge, defense doesn't have to prove a
> thing in this case.  But, ladies and gentlemen, if you're going to claim, claim that, you
> know Micros Only is responsible for the good scores and when they leave the bad scores
> occur, well, you have to do more than just say, oh, look at the chart.  You've got to do
> more than that.  You've got to explain it.

Now, what Mr. Tanner did during his presentation is he read a stipulation, a couple of stipulations to you, couple of documents attached. One of the things in one of those stipulations was, in calculating SEMAP scores, HUD factors in 14 different factors. . .

Mr. Tanner didn't bother reading you what those actual 14 factors are, there are all kind of them. I'm not going to take the time to do it either. Frankly, this is meaningless and has nothing to do with this case. But if you go to P-HUD, dash S2, that's their exhibit, you can read them. They're on the first into the second page of the stipulation. There's (sic) 14 different factors that go into calculating this score.

And so the question I post to you is, how on earth do we know, more importantly, how on earth do you know, that what if any of those 14 factors were affected by any of the data entry work that these Micros Only data entry people did? Who knows? It's not clear. It's not proven. It's not established. But it sure looks good; doesn't it? Oh, Micros Only is there and good scores, Micros Only leaves, bad scores, therefore, it must be Micros Only. Look at the factors. The fact of the matter is, there's no linkage between Micros Only and these scores. At least it's not established in any way that you can actually draw that conclusion.

But more importantly, frankly, these SEMAP scores, they're just frankly a distraction. They prove nothing.

What do SEMAP scores have to do with falsifying a proposal and obtaining a computer contract using false information? You know, pretending to be a company that doesn't even exist anymore and using phony names?

What do SEMAP scores have to do with obtaining a half million dollar rehab loan. Absolutely nothing at all.

(Tr. 5611-13).

## Discussion:

The Government's argument was proper and did not shift the burden of proof. As noted above, the Second Circuit has long held that "the government may comment on a defendant's failure to call witnesses to support his factual theories." *United States* v. *Bautista*, 23 F.3d at 733; *see also United States* v. *McDermott*, 918 F.2d at 327. Such comments become improper

"only when the evidence that the defendant has not adduced is in the control of the defendant alone or where the jury would naturally and necessarily interpret the Government's summation as a comment on the defendant's failure to testify." *United States* v. *McDermott*, 918 F.2d at 327. Similarly, "[t]he Government may not, . . . go further and suggest that the defendant has the burden of producing evidence." *United States* v. *Bautista*, 23 F.3d at 733.

The Government's argument fell well within the permissible limits. In the first instance, the Government emphatically reminded the jury that the defendant was not required to prove anything and that she had no burden of proof. Nor could the jury naturally or necessarily have interpreted the Government's summation as a comment on Post's failure to testify. Rather, the Government's remarks addressed the quality and strength of the SEMAP evidence, arguing that there was no evidence of any linkage between the 14 factors that made up a SEMAP score and the actual work performed by the Micros Only employees who were responsible for some undetermined amount of data entry work in the Section 8 Department. None of these remarks related to evidence rebuttable solely by either Post or Charles. The Government was plainly entitled to highlight for the jury the lack of evidence supporting Post's factual theory that the SEMAP scores and the work of Micros Only data entry workers was related, given Post's claim regarding her lack of intent to deprive the City of Mount Vernon and HUD of money and property. Finally, the Government argued that the SEMAP scores had nothing to do with this case and proved nothing. All of that was fair comment and did not shift the burden of proof. While Post was certainly permitted to argue to the jury that there was a "temporal correlation between the work of Micros Only" and the SEMAP scores, Post Br. 7-8, the Government was

equally entitled to challenge that assertion and point out that there was insufficient proof to conclude that there was any connection and that is all that the Government did. The Government's remarks were no more than an attack on the credibility of Post's argument and in no way implied that Post had a burden to produce evidence. Indeed, the remarks were immediately prefaced by the statements that the "defense has absolutely no burden of proof" and "doesn't have to prove a thing in this case."

### 3. The Payment of $31,000 From Charles to Post

Post finally argues that the "Government never offered any evidence as to the reason" Charles paid Post a total of $31,000 and therefore, there was no basis for it to argue in summation that the payments were a "bribe," or a "kickback," or a "thank you" for her role in the charged conspiracy and fraud scheme were improper. Post Br. 5-6. Post is simply wrong. There was ample evidence presented by the Government in this case to support the logical inference that the payment of $31,000 was an illicit payment to Post from her co-conspirator Charles for her participation and assistance in the scheme.

**Relevant Facts:**

Prior to the start of trial, Post moved *in limine*, to preclude the Government from introducing any evidence relating to the payment of two checks from Charles to Post totaling $31,000. In support of this motion, Post argued at that there would be no testimony or evidence introduced at trial linking the payments to a "bribe, kickback, or for that matter in any way relevant to the alleged scheme to defraud." (Deft's Mem. In Opp. To Govt.'s Suppl. Trial Mem. at 9; Doc #108). The Court denied Post's motion.

At trial, the Government introduced into evidence records from a number of Post's personal bank accounts, including those from one of her accounts at the Bank of New York. (GX 2101). Among the records from that account were two checks, one written from a Charles personal bank account with Citibank, dated February 26, 2004, signed by Charles, and made payable to Post for $30,000 and a second check written from another Charles personal bank account with HSBC Bank, dated July 5, 2004, signed by Charles, and made payable to Post for $1,000. (GX 2101-A, GX 2101-C). Post's name appearing on the payee line on each check appeared to be in Post handwriting.

**Discussion:**

The Government presented an overwhelming amount of evidence as to the reason Charles paid Post $31,000. That evidence established that Charles paid Post that money because of her role in the scheme in this case. As described above, the evidence established that Post fraudulently induced the MVURA to award Charles's Micros Only a computer services contract even though, as Post well knew, Charles in fact had no computer services company, no experience in the computer field, and no employees who could service the contract. In attempting to convince the MVURA Board to award the contract to Charles's Micros Only company, Post falsely represented to the MVRUA Board that Micros Only was a company with a history of clients and qualified to perform under the contract. After the Board authorized the contract, Post recommended that the Board extend the contract four different times, which ultimately resulted in the payment of over $1 million of HUD money to Charles.

In requesting that the MVURA Board extend the original contract with Micros Only four times, Post made various material false statements and omissions to the Board in order to ensure that the contract was extended. Post, who as MVURA executive director was responsible for ensuring that all MVURA directives and contracts were faithfully complied with, ignored the MVURA Board's spending limits and other restrictions to aid Charles in their scheme. And as the evidence established, Post and Charles used the contract as a vehicle to steal hundreds of thousands of dollars from Mount Vernon and HUD, with Charles being the primary beneficiary.

Post was also instrumental in helping Charles obtain the $500,000 loan. She concealed from the Board the fact that he was the principal of Micros Only and that he was using aliases to conduct business with the MVURA under that contract. Post also helped conceal the existence of the loan from the persons responsible for keeping track of it and collecting payment on it, ensuring that Charles would not have to make any loan payments for nearly two years. And Charles made the two payments to Post of $30,000 and $1,000 in February and July of 2004, during that very same time period.[12]

Based on this evidence, the jury could logically have found that the $31,000 paid to Post was for her participation in the scheme that resulted in the theft of hundreds of thousands of dollars of

---

[12] The evidence at trial established that the $31,000 was not the repayment of a loan by Charles to Post. During the time frame in question, Post was in no position financially to loan Charles that amount of money. The testimony and evidence provided by Joy Franklin, the Executive Vice President and Chief Operating Officer of American Credit Alliance, established that Post was in the process of paying off credit card debt during the time of the scheme between 1998 and 2005. (Tr. 4052-83; GX 2105). In addition, Post's many personal bank accounts, with modest balances, and other financial records, which were introduced into evidence, (GX 2101, GX 2102, GX 2103, GX 2104, GX 2105, GX 2106, GX 2107, GX 2108), showed that Post did not have the means to lend Charles that kind of money.

HUD money.  Whether the money was in actuality a bribe, gratuity, kickback, a "thank you" or simply a share of the stolen money, given the overwhelming nature of the proof, the jury could easily infer that these were illicit payments made to her as a result of her participation in the scheme to defraud.  Accordingly, the Government's argument in its summations was amply supported by the evidence.

### B.  Defendant Charles's Claims

### 1.  Joseph Sparano's Testimony

Charles argues that his conviction should be set aside and a new trial ordered because the Government, in its rebuttal summation, misstated the testimony of Joseph Sparano concerning a document introduced into evidence by the defense during the Government's case-in-chief. Charles also argues that Court's instruction to the jury regarding that misstatement was inadequate to cure the error.  Charles's claims are meritless.

**Relevant Facts:**

In its case-in-chief, the Government called as a witness Joseph Sparano, a friend and sometime business associate of Charles.  (Tr. 2125-73).   During the course of his direct testimony, Sparano was shown and questioned about a commercial lease for a store in Charles's building at 3 East 3rd Street in Mount Vernon, which was the building that Charles was renovating with the $500,000 materials only loan from the MVURA.  (Tr.  2144-51).  The lease was signed by Charles and purportedly signed by Sparano and both signatures were notarized. (GX 1188).   When shown the lease, Sparano testified that the signature on the lease was not his, that he had not authorized anyone else to sign his name to the lease, that he had never paid the

$6,060.50 security deposit as reflected in the lease, and that he had never entered into that lease or agreed to pay the rent described therein. (Tr. 2149-51; GX 1188). Sparano also testified that he had never had a business called "J.Sparano Professional Services," which was the name of his supposed business on the commercial lease. (Tr. 2127; GX 1188). Charles ultimately submitted this fraudulent lease, as well as a second fraudulent lease with the forged signature of either Donald Robinson, Sr. or Donald Robinson, Jr., to CPC as part of the scheme in this case in order to get CPC to take Charles out of one-half of the $500,000 loan he owed the MVURA, reducing the amount Charles owed to the MVURA to $250,000. (Tr. 2173-2219; 4442-54, 4465-68). Before CPC would agree to pay the MVURA one-half of what Charles owed ($250,000), it required Charles to demonstrate that his renovated building at 3 East 3rd Street would generate sufficient income through its leases and rent roll to allow Charles to pay off his loan to CPC. (Tr. 4468). Charles provided the fraudulent leases to CPC for that purpose and, believing that the leases were genuine, CPC paid the MVURA $250,000 to reduce Charles $500,000 loan to $250,000. At that time, CPC entered into a separate loan agreement with Charles for a total of $638,000. (Tr. 4455).

During cross-examination of Sparano, Charles introduced into evidence, an unrelated "business certificate" for a business called M&J Tax Service at 5 East 3rd Street in Mount Vernon, which seemed to have had little, if any, relevance to the charges in this case. (DX C-JS-A). The certificate was supposedly signed by Sparano, although his first name was misspelled. The certificate was dated January 18, 2006, which was outside the 1998 to 2005 time frame of the scheme and conspiracy charged in this case. The certificate had no apparent relevance to the

computer services contract or to the $500,000 loan in this case.  On cross-examination, Sparano testified that the signature on the document was his.  On redirect examination, Sparano testified that he did not prepare the certificate.  When it was then pointed out to Sparano that the spelling of his first name in his signature was misspelled as "Joesph," he acknowledged that it was not his practice to misspell his first name when signing his name.  When pressed further, Sparano testified that the signature looked like his, although he did not normally misspell his first name when providing his signature.

During its rebuttal summation, the Government, having misremembered the testimony, mistakenly argued that Sparano had disavowed his signature on the business certificate during his testimony.  The prosecutor's recollection of the precise testimony was wrong.

The next day, before the Court completed its charge to the jury, Charles objected to the Government's remarks regarding Sparano's signature and requested a mistrial. (Tr. 5724-25). After determining that the Government had in fact misstated the testimony, the Court offered defense counsel the choice of either giving a surrebuttal summation to address the issue or having the Court give a curative instruction to the jury advising it that the Government's rendition of Sparano's testimony was not accurate. (Tr. 5728-29).  Defense counsel chose the curative jury instruction.  (Tr. 5728).  The Court then told the jury that the Government's statement in its rebuttal summation -- that Sparano testified that the signature on the certificate "couldn't be his signature" -- was not his testimony and that the Government's assertion "doesn't square with the testimony."  The Court then advised the jury that they could review the transcript of Sparano's testimony during jury deliberations.  (Tr. 5735-36).

41

**Discussion:**

Charles first claims that he was prejudiced by the Government's argument and that the Government did not have a good faith basis to argue that the certificate contained a forged signature of Sparano. He also claims that the Court's curative instruction was deficient. Charles is wrong on both counts.

In the first instance, the Government had a good faith basis to argue that the certificate contained a forged signature. The evidence, as described above, established that Charles employed numerous fraudulent documents, in which he forged the names of other persons, throughout the course of the scheme. Charles forged the signature of Dante Brown and used without permission the name of Brown's company, Micros Only, on the proposal for the computer services contract and accompanying cover letter submitted to Post and the MVURA. (GX 102-E). After being awarded the contract, Charles signed the contract with the name "William Brown." (GX 518). In submitting vouchers to the MVURA for payment throughout the duration of the contract, Charles signed each of the 184 vouchers with the name "William Brown." (GX 200-GX 383). Charles also used the name "William Brown" on numerous other documents. (*See, e.g.,* GX 500-O, GX 532). During the $500,000 loan phase of the scheme, Charles submitted two fraudulent commercial leases to the Community Preservation Corporation as part of his efforts to have that company payoff one-half of the loan to the MVURA. (GX 1186, GX 1188). Charles forged the signatures of Joseph Sparano and either Donald Robinson, Sr. or Donald Robinson, Jr. on the two leases and had those signatures notarized. (*Id.*; Tr. 2149, 2181-82, 2199). Charles also sent the fraudulent "Thornton Meacham" letter to the MVURA in

42

2003 seeking additional payments under the Micros Only contract and forged Mr. Meacham's name on that letter.  (GX 590, GX 590-B).

Irrespective of whether or not the Government's argument was particularly persuasive, given the volume of fraudulent documents created and used by Charles during the course of the scheme and the phony names and forged signatures he employed, the Government had more than a good faith basis to believe and argue that the misspelled signature of Joseph Sparano on the business certificate was yet another a forgery created by Charles on yet another phony document.

Given the volume of fraudulent documents created and used by him in the charged scheme, Charles has failed to demonstrate how the mistaken misstatements in the Government's rebuttal summation regarding a business certificate that was dated in 2006, after the charged conduct in this case, and which literally had nothing to do with the crimes charged in this case so unfairly prejudiced him.   Moreover, to the extent there was any prejudice, the Court's curative instruction advising the jury that there was no evidence to support the Government's factual assertion removed any possible prejudice.

Charles next claims, for the very first time, that the curative instruction was insufficient to cure the error.  He complains that the instruction "was not what was requested and consented to" and that the jury was not "told that the witness had not disavowed his signature."  Charles Br. 15. This claim is likewise meritless.

In the first instance, Charles did not object to the instruction or ask the Court to supplement it in any way.  Having failed to do so, Charles has not preserved this alleged error.  Because of this, the plain error standard applies requiring that the Court reject any assignment of error that does

not "amount to a flagrant abuse" which "seriously affects the fairness, integrity, or public reputation of judicial proceedings," and causes "substantial prejudice" to the defendant. *United States* v. *Carr*, 424 F.3d 213, 227 (2d Cir. 2005); *United States* v. *Williams*, 690 F.3d 70, 75 (2d Cir. 2012).

The Court's failure to instruct the jury precisely as Charles had requested did not affect the fairness, integrity, or public reputation of the judicial proceeding or cause "substantial prejudice" to the defendant. In fact, the Court's instruction eliminated any conceivable prejudice to the Charles. While it did not use the precise language requested by Charles in its instruction, the Court advised the jury in no uncertain terms that the Government's factual assertion regarding Sparano's signature was not consistent with the actual testimony and that the transcript of the testimony would be available to them. To the extent that there was any prejudice to Charles as a result of the Government's misstatement about a document that had no relationship to the charges in this case, the Court's instructions alleviated that prejudice.

### 2. The "Double-Billing" Argument

Charles next claims that the Government's argument in its rebuttal summation -- that he had double-billed the MVURA for $2,565 -- deprived him of a fair trial because he did not have the opportunity to respond to it. He argues that had the Government made that argument in its principal summation, he could have responded to it by arguing to the jury that the billing was a clerical error and not an act of theft. The Government's argument did not deprive Charles of a fair trial.

**Relevant Facts:**

In its case-in-chief, the Government called Jason Blake as a witness. Blake's testified essentially about two things: first, a meeting he attended in May of 2002 or 2003 with the then mayor of Mount Vernon Ernest Davis and second, a Micros Only letter purportedly prepared and signed by Blake and sent to Michael Leigh disputing Leigh's claims for payment.

Blake testified that Charles had asked him to attend a meeting at the offices of the mayor of Mount Vernon in May of 2002 or 2003 concerning a contract Charles had with Mount Vernon that Charles was either in jeopardy of losing or had lost. (Tr. 2224, 2229). Blake did not know what the contract was for or the name of Charles's company. (Tr. 2225). Charles had told Blake that the mayor was an avid tennis player and that a discussion of tennis would help get the meeting off to a good start. (Tr. 2227). Blake, who had been a college tennis player and whose younger brother, James Blake, was a successful professional tennis player, agreed to attend the meeting on Charles's behalf. (Tr. 2224-27, 2228). Unbeknown to Blake, the meeting was an effort by Post and Charles to revive the Micros Only contract with the MVURA, which had expired and which the MVURA Board had refused to extend. Post also attended the meeting with the mayor but Charles did not. (Tr. 2229-30). During the meeting, Blake talked tennis with the mayor and thereafter, the mayor and Post spoke about the contract. (Tr. 2230-34).

On direct examination, Blake was also questioned about Government Exhibit 567, which was a letter on Micros Only stationary dated June 1, 2002, addressed to Michael Leigh, and purportedly signed by Jason Blake, who was identified in the letter as the "President" of Micros Only. (GX 567).

As the Court will recall, Michael Leigh was also shown Government Exhibit 567 during his testimony. Leigh testified that he had received the letter in the mail and was upset by it because he had not been paid all that he was owed by Micros Only and the letter disputed his claims. (Tr. 1990-93). Leigh also testified that he did not know a Jason Blake and had never heard that name associated with Micros Only before receiving the letter. (Tr. 1994).

Blake testified that he did not write the letter or have anything to do with its preparation, did not know who Michael Leigh was, knew nothing about the content of the letter, and did not sign or authorize anyone to sign his name to the letter. (Tr. 2239-41). Blake also testified that he never worked for Charles in any capacity, did not know what business or businesses he had, and never worked for or held any positions with a company called Micros Only. (Tr. 2225, 2230, 2238, 2242).

On cross-examination, Blake testified, among other things, that he had a close relationship with Dante Brown, who had been his tennis coach and a mentor, and knew that at one time, Brown had a company called Micros Only. (Tr. 2243-47). Blake was also questioned about Government Exhibit 567, (Tr. 2253-54), and maintained that the signature on the letter was not his. (Tr. 2255-56, 2259-60). Defense counsel showed Blake two other documents that in fact contained Blake's signature. (Tr. 2254-60; DX C-JB-A, DX C-JB-B). Blake identified his signature on a number of the pages from those two documents. (Tr. 2255, 2259).

During Charles's summation, counsel sought to discredit both Michael Leigh and Jason Blake. In addressing Leigh's complaints in his testimony that he had not been paid in full by Micros Only and Charles, counsel belittled those complaints and argued in fact he had been paid

in full and referenced a number of defense exhibits that supported that claim.  (Tr. 5568-69).   In discussing Blake's testimony, counsel argued that Blake became involved in Micros Only through his friend and mentor Dante Brown – and not through Charles – and argued that Blake had prepared and signed the letter to Leigh that was Government Exhibit 567.  (Tr. 5588-93).   In claiming that Blake prepared and signed the Micros Only letter to Leigh, counsel argued that the signature on the letter resembled Blake's signatures on Defense Exhibits DX C-JB-A and DX C-JB-B. (Tr. 5590-92).  Indeed, counsel went so far as to argue that the Government had deliberately avoided even mentioning Blake's testimony in its principal summation because the defense's cross-examination had established Blake's involvement with Brown in the scheme. (Tr. 5592).

In its rebuttal summation, in addressing Government Exhibit 567 and the defense claims that Jason Blake was involved in Micros Only, had been brought into the company by Dante Brown, and had written and signed the letter, the Government first noted for the jury that there was not a single check from the Micros Only Computer Concepts bank account, which was controlled by Charles, that was made payable to Dante Brown or Jason Blake.  (Tr. 5637).  The point being that neither Brown nor Blake had anything to do with Charles's company.  The Government then argued that Government Exhibit 567 was a phony letter "put together by Wayne Charles[,]" and addressed the content of the letter itself, pointing out that in the second paragraph of the letter it stated to Leigh: "You have a bill dated May 21, 2001, invoice number 43.  We have no record of that INVOICE."  (Tr. 5637; GX 567).  The Government then argued that the statement about invoice number 43 in the letter was a lie; that Government Exhibit 299, a Micros Only voucher

dated May 28, 2001 and submitted to the MVURA by Charles for payment, had attached to it Leigh's invoice number 43 and documentation that established that Micros Only had been paid in full on that voucher. (Tr. 5637-38). This evidence addressed and disproved counsel's claim or suggestion that Leigh was paid in full for the work he performed. The Government then pointed out that Government Exhibit 382, another Micros Only voucher dated June 21, 2002 and submitted to the MVURA by Charles for payment, had attached to it another copy of invoice number 43 that Leigh had apparently reprinted and submitted as a result of the letter. This Government exhibit also had documentation attached to it that proved that the MVURA paid Micros Only in full on the voucher, including for invoice number 43. (Tr. 5638). This disproved Charles's claim, in summation, that Blake was the author of the letter since the evidence overwhelmingly established that Charles controlled the submission of vouchers to the MVURA (on which he repeatedly signed the name "William Brown") and all payments from the MVURA to Micros Only.[13] The Government, of course, also argued that this was yet another way that Charles had stolen from Mount Vernon and HUD and that there was "no limit to his thievery." (Tr. 5638-39).

Charles raised no object to this argument during the Government's rebuttal summation or at any other time during the trial.

---

[13] While Government Exhibit 567 identified Jason Blake as the President of Micros Only, the "Thornton Meacham" letter identified <u>James Blake</u> as the President of Micros Only. (GX 567, GX 590). There, of course, was not a scintilla of evidence that James Blake had anything to do with Charles's Micros Only. The letters reflect Charles's propensity to use other persons' names in this scheme, without their knowledge or permission, to conceal his own involvement.

**Discussion:**

Charles now argues for the first time that he was unfairly prejudiced by the Government's double-billing argument. Charles Br. 17. Charles further claims that had the Government made the argument in its principal summation, he would have been able to address the argument and provide an innocent explanation for the double-billing. Charles Br. 19. The Government's argument did not deprive Charles of a fair trial.

Charles does not dispute the fact that the argument that he now complains about was supported by the Government's evidence. Government Exhibits 299 and 382, which were admitted into evidence during the trial, clearly established that Charles submitted Leigh's invoice number 43 on two separate occasions and that the MVURA paid him each time. (GX 299 and 384). It is also not disputed that Micros Only was paid a total of $2,565 each time for the work described in invoice number 43. Furthermore, Charles concedes that had the Government made this identical argument in its principal summation, he would have had no basis to object to it. His complaint is that he had no opportunity to respond to what is being called the double-billing argument. Concededly, the Government never explicitly fronted for the jury, during the evidentiary portion of the trial, the fact that invoice number 43 had been submitted by Charles to the MVURA on two different occasions and paid each time.

While citing no authority, Charles's claim is based on the principle that in a rebuttal summation, the Government may only respond to a defendant's argument and not bring in new matters. *See United States* v. *Gleason*, 616 F.2d 2, 25-26 (2d Cir. 1979), *cert. denied*, 444 U.S. 1082 (1980); *United States* v. *Giovanelli*, 945 F.2d 479, 495 (2d Cir. 1991) (J. Newman,

concurring); *United States* v. *Russo*, 74 F.3d 1383,1396 (2d Cir. 1996). It was not the Government's intention to introduce a new matter by way of this argument, but instead, as explained above, to respond to Charles's summation. Nor did the Government deliberately withhold this argument for rebuttal summation so that Charles would have no opportunity to respond to it. While the Government believes that its argument was a proper response to Charles's summation, as explained above, to the extent the Court disagrees, that does not end the inquiry.

Even if the Court were to conclude that the double-billing argument was a "new matter" and not proper rebuttal, Charles would still not be entitled to a new trial. Having failed to object to this part of the Government's rebuttal summation, Charles has not preserved this alleged error. Because of this, the plain error standard applies requiring that the Court reject any assignment of error that does not "amount to a flagrant abuse" which "seriously affects the fairness, integrity, or public reputation of judicial proceedings," and causes "substantial prejudice" to the defendant. *United States* v. *Carr*, 424 F.3d 213, 227 (2d Cir. 2005); *United States* v. *Williams*, 690 F.3d 70, 75 (2d Cir. 2012). Furthermore, because the alleged error occurred in summation, Charles is entitled to relief only if he can show "that the comment, when viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudiced him." *Farhane,* 634 F.3d at 167. Charles cannot make such a showing.

The remarks in question, even if improper, did not seriously affect the fairness or integrity of the trial or cause Charles substantial prejudice. In the first instance, the evidence proving

Charles's guilt, as described in detail above, was simply overwhelming.[14]  The evidence proved that while using phony identities and submitting numerous fraudulent and phony documents to the MVURA, Charles stole hundreds of thousands of dollars from the City of Mount Vernon and HUD.  Moreover, and perhaps most significantly given this challenge, the evidence also proved that Charles used a variety of methods to steal HUD money.  During the course of the scheme, Charles stole money from Mount Vernon and HUD by (1) charging for and getting paid more than the monetary limits set by the MVURA Board under the original contract and the first three extensions; (2) charging for services – data entry and accounting – that the Board had not approved under the contract; (3) charging for data entry services at an inflated rate of $50 per hour which had not been approved by the Board; (4) charging for data entry services in the Management Services Department, for which HUD money could not be used, at an even greater inflated rate of $70 per hour; (5) charging for services after the computer services contract had expired and was no longer in effect; and (6) failing to pay back any of the $250,000 remaining from the $500,000 loan .  Given the variety of methods Charles used to steal money during the course of the scheme and the amount of money he stole – hundreds of thousands of dollars under the computer services contract and another $250,000 from the loan – the one-time theft of $2,565 during a single incident of double-billing could not possibly have unfairly prejudiced Charles.[15]

---

[14] On February 9, 2011, during argument on the post-trial motions filed after the first trial of this case, the Court noted several times during the course of that proceeding that the Government's proof at that trial was "overwhelming."  2/9/11 Tr. at 11, 12, & 61.  The Government would submit that the evidence against both Charles and Post was even stronger at the 2015 trial.

[15] Charles's claim that the Government "portrayed" its double-billing argument "as a smoking gun" is simply wrong.  To begin with, the Government never used the phrase "smoking gun,"

Having failed to prove that he suffered substantial prejudice based on the Government's argument regarding a one-time theft of a mere $2,565, this motion should be denied.

## Point III

### The Court's Rulings on Charles's Post-Trial Motions
### Are the Law of the Case

Finally, Charles asks the Court to set aside the verdict in this case based on post-trial motions filed by the defendants following their convictions after the original trial in 2009. Specifically, Charles seeks to adopt the motions in Points I and II in the January 21, 2010 submission filed by the defendants following their convictions after the original trial of this case. In Point I, the defendants argued that Counts One and Two of the Indictment should be set aside because the proof at trial constructively amended the indictment or created a prejudicial variance. In Point II, the defendants argued that, because of the constructive amendment or prejudicial variance argued in Point I regarding the $500,000 loan, the Government failed to prove any criminal conduct fell within the applicable statute of limitations. The Court rejected each of these arguments in its decision announced from the bench on February 9, 2011.

The law of the case doctrine dictates that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991). Concededly, the doctrine is discretionary and

---

nor suggested that its argument was a "smoking gun." And given the various methods Charles used to steal money from the City of Mount Vernon and HUD and the amounts he stole, the so-called double-billing argument, which involved the one-time theft of a mere $2,565, could hardly be characterized as a "smoking gun."

does not prevent the Court from reconsidering an issue previously decided.  *See American Hotel International Group, Inc.* v. *Onebeacon Insurance Company*, 611 F.Supp.2d 373 (S.D.N.Y. 2009).  Nevertheless, courts generally only depart from the law of the case when there is a change in controlling law, when new evidence becomes available, to correct a clear error, or prevent manifest injustice.  *DiLaura* v. *Power Authority*, 982 F.2d 73, 76 (2d Cir. 1992).  Here, in renewing these motions, Charles does not cite any change in the controlling law or present no new evidence that should cause the Court to reconsider its rulings, and fails to demonstrate in any other way that reversing its previous rulings is necessary to prevent a manifest injustice. Accordingly, the Court should reject these motions.

## Conclusion

The defendants' motions should be denied.

Dated:  New York, New York
        February 19, 2016

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York

                        By:  s/Andrew S. Dember
                             Andrew S. Dember
                             Daniel P. Filor
                             Assistant United States Attorneys
                             Tel.: 212-637-2563/914-993-1912

Andrew S. Dember deposes and says that he is an Assistant United States Attorney employed by the Office of the United States Attorney for the Southern District of New York.

That on February 19, 2016, he caused to be served by ECF a copy of the within Government's Memorandum of Law In Opposition to Defendants' Motions, Pursuant To Rules 29 And 33 Of The Federal Rules Of Criminal Procedure, For A Judgment Of Acquittal Or A New Trial on:

> Stephen R. Lewis, Esq.
> Stephens, Baroni, Reilly & Lewis, LLP
> 175 Main Street, Suite 800
> White Plains, New York 10601
>
> And
>
> Howard E. Tanner, Esq.
> Tanner & Ortega, LLP
> 175 Main Street
> Suite 800
> White Plains, New York 10601

I declare under penalty of perjury that the foregoing is true and correct.   28 U.S.C. § 1746.

s/Andrew S. Dember
Andrew S. Dember

Dated:      February 19, 2016
            New York, New York