UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
UNITED STATES OF AMERICA                     Docket No.: 08-cr-0243 (KMK)

     -against-

CONSTANCE G. POST and                        **RESPONSE TO GOVERNMENT'S**
**WAYNE CHARLES**,                               **OPPOSITION TO DEFENDANT'S**
                                             **RULES 29 AND 33 MOTIONS**

                      Defendants.
-----------------------------------------------------X


**TO:**      **PREET BHARARA, UNITED STATES ATTORNEY**
             **SOUTHERN DISTRICT OF NEW YORK**

             **ANDREW DEMBER, ASSISTANT UNITED STATES ATTORNEY**
             **DANIEL FILOR, ASSISTANT UNITED STATES ATTORNEY**

---

**DEFENDANT WAYNE CHARLES' RESPONSE TO THE GOVERNMENT'S
OPPOSITION TO HIS MOTION FOR A JUDGMENT OF ACQUITTAL PURSUANT
TO FEDERAL RULE OF CRIMINAL PROCEDURE 29 AND/ OR FOR A
NEW TRIAL UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 33**

---

Respectfully submitted,

**STEPHEN R. LEWIS, ESQ.**
**Stephens, Baroni, Reilly & Lewis, LLP**
*Attorneys for Defendant, Wayne Charles*
175 Main Street, Suite 800
White Plains, New York 10601
Telephone: (914) 683-5185

## RULE 29 MOTION

The Government in its responsive papers in opposition to the Defendant's argument that it failed to prove the contemplated harm element of mail fraud, once again prejudicially peddles, as it did to the jury, that Post and Charles obtained the $500,000 construction loan to steal money from the Mount Vernon Urban Renewal Agency (hereinafter "MVURA"). "After fraudulently obtaining the 500,000 loan with Post's help, Charles, also with Post's assistance, never paid the $250,000 that he owed to the MVURA after the Community Preservation Corporation ("CPC") paid off one-half of the loan." (Government's opposition papers dated February 19, 2016, pg. 15 [hereinafter referred to as "Gov. opp. pg.__"]).

After the testimony of defense witness Ted D'Amore, the Government not once mentioned the purported architectural services that by indictment it asserted was part of the illegal, illicit theft and conspiracy perpetuated by Charles and Post. Their obvious abandonment of this aspect of the indicted charge was necessary to maintain credibility with the jury in light of the trial proof that the services were performed and, at least as to the Sanford Boulevard property, would have only benefitted the owner of the property, Mayor Ernie Davis.

Initially, it was believed that the Government's continued advocacy that the $500,000 loan was fraudulent, was based upon its misunderstanding of secured transactions and a failure to understand how the City of Mount Vernon was and remains fully protected as to its investment in the 3 East Third Street property. This however cannot be the case as the Government concedes that the $250,000 loan was assumed by Mubrook Realty, LLC at the time the property was sold on June 1, 2010. "Charles still owed $250,000 in 2010 when he sold 3 East 3rd Street and the new owner assumed Charles' $250,000 debt to

2

the MVURA based on that loan." Gov. opp. pg. 15. (See also, Gov't Ex. 1231 - 9/18/2003 mortgage between Charles Group, Inc. and MVURA for $250,000; Defense Exhibit C-SM-B - CPC's pre-closing statement for the June 1, 2010 sale, and Defense Exhibit C-SM-G June 1, 2010 transfer deed from Charles Group, Inc. to Mubrook Realty, LLC).

The following facts cannot be disputed:

Wayne Charles, through his corporation, Charles Group, Inc., purchased the 3 East Third Street property (also known as 5 East Third Street) in Mount Vernon. As part of Mayor Davis's Third Street Initiative Program, the Defendant undertook a full gut-rehabilitation of the building. In 2000, he applied for and received a $500,000 construction loan (materials only) from the Mount Vernon Urban Renewal Agency. On July 31, 2000, at the closing of this construction loan, a loan agreement was executed and a mortgage which secured the $500,000 loan was executed and thereafter filed with the Westchester County Clerk as a matter of public record. (Gov't Ex.1070-A). The $500,000 was subsequently paid out in periodic construction draw downs over a period of many months based upon approximately ten separate applications and inspections by Lou Albano as part of an inspection and approval process.

Three years passed, and as contemplated from the beginning, CPC came in and lent the Defendant's corporation a permanent loan of $638,000 on the now rehabilitated building. On September 18, 2003, a closing was held where the parties, including the MVURA, were represented by counsel. On that date a satisfaction of the $500,000 mortgage was executed and subsequently filed with the Westchester County Clerk as a matter of public record. (Gov't Ex. 1277). From the $638,000 monies being loaned, the

3

Defendant authorized $250,000 of the loan proceeds to be paid to MVURA as well as all of the interest that was owed to Mount Vernon on the loan, $19,301.04. (Gov't Ex. 1230; Defendant's Ex. C-CS-A). A new mortgage of $250,000 constituting the unpaid principal balance was executed and subsequently filed with the Westchester County Clerk along with a subordination agreement subordinating Mount Vernon's new $250,000 mortgage to CPC's mortgage for $638,000. (Gov't Ex. 1231 and 1231A). A total therefore of $888,000 of debt obligation to CPC and MVURA was secured by the building as a matter of public record.

On June 1, 2010, the property was sold to Mubrook Realty, LLC for $950,000. Instead of the seller receiving that money from the purchaser, the debt obligations as to both the CPC and MVURA loans were assumed by the purchaser. The loans and the mortgages were assumed with the consent of all parties, including the MVURA. The debt secured by the mortgages, filed as a matter of public record, remained fully secured by the building itself.

So from these transactions, it is obvious that as of September 2003, one-half of the $500,000 construction loan with applicable interest had been paid in full and a new mortgage for $250,000 with new terms and interest rate was executed, filed and secured the remaining debt obligation.[1] That mortgage still secured the debt to MVURA even after the June 1, 2010 transfer based upon Mubrook Realty, LLC's assumption of the obligation, a necessary prerequisite for the June 1, 2010 closing.

---

[1] This is the basis for the constructive amendment and prejudicial variance arguments raised by former counsel and adopted by reference in the instant Rule 29 application.

4

It is necessary therefore to realize that the Government in its opposition supports its argument with half truths.  Again, the Government states:

> "After fraudulently obtaining the $500,000 loan with Post's help, Charles, also with Post's assistance, never paid the $250,000 that he owed to the MVURA after the Community Preservation Corporation ("CPC") paid off one-half of the loan."  (Gov. opp. pg. 15).

The $250,000 paid to Mount Vernon at the September 18, 2003 CPC closing was not CPC's money. It was the Defendant's, as his company, Charles Group, Inc., became obligated for those monies based upon the $638,000 debt obligation to CPC, secured by a recorded mortgage. The $250,000 unpaid balance owed to MVURA ultimately became the debt obligation of Mubrook Realty, LLC, who instead of giving the Defendant $250,000 at the June 1, 2010 closing, assumed that debt on the Defendant's behalf. MVURA's loan remained secure. How therefore can there be any legitimate claim that Charles contemplated financial harm to the City of Mount Vernon, its citizens or HUD?  There is no basis for this. The refinancing and the Government's arguments created a constructive amendment of the indicted offense and prejudiced the Defendant in its wrongful inclusion before the jury.

## RULE 33

What is remarkably absent from the Government's opposition is any acknowledgment or mention of the affidavit of the notary, Myriam Vazquez-Florenzan, substantiating Mr. Sparano's signature on the January 18, 2006 Business Certificate.  (See Exhibits A and B to the Defendant's Rules 29 and 33 Motions).

In his rebuttal summation, the Government stated:

> During the course of Mr. Sparano by Mr. Lewis, he showed him another document. He asked him a number of questions about being in businesses with Wayne Charles and, gee, weren't one of those businesses like the tax service business you were going to have at the 3 East Third Street building?
> He said, yeah. And then he introduced into evidence a business certificate. We're going to put it up on the screen. You'll remember this, I think. It's a business certificate.
> See, not only is Mr. Charles good at fabricating documents, apparently he's really good at duplicating peoples' signatures.
> Remember Joseph Sparano? I got up back on redirect examination of Mr. Sparano after Mr. Sparano told had you, yes, this is his document, that's his signature. And I pointed out to Mr. Sparano that he - - I asked him how you spelled his first name. He told us the typical way you spell the name Joseph. Then he looked carefully and he realized, oops, that couldn't be his signature, really, because when he signs his name, he usually spells it correctly. And it's not mis - - it's not spelled there.
> He got off the stand, almost muttering, boy, that really looked like my signature.  Obviously, you can see it wasn't. Okay? It was a phony document likely prepared by Wayne Charles and signed by Wayne Charles.
> MR. LEWIS:  Objection.
> THE COURT:  Overruled.  It's argument.
> (TT 5635-5636).

The Government now explains: "During its rebuttal summation, the Government, having mis-remembered the testimony, mistakenly argued that Sparano had disavowed his signature on the business certificate during his testimony.  The prosecutor's recollection of the precise testimony was wrong ....

[and] ... the Government had in fact misstated the testimony, ..." (Gov. opp. pg. 41).

The Government, having the last word, told the jury the exhibit in evidence, offered by the defense was a "phony document". In fact, as is substantiated not only by the notary stamp (which was not shown to the jury, when in the rebuttal summation the document was placed on the ELMO, TT 5725 line 13-18), but by the submitted affidavit of the notary, the document was real and signed by Sparano. The Government misstated testimony and without any good faith basis, in effect poisoned the jury as to defense counsel's credibility, asserting that the Defendant, by his attorney, had submitted a fraudulent phony document for their consideration.

Although objected to and preserved, the Court refused to cure the Government's assertion to the jury that the defense exhibit was a fraud. After the Court agreed to give the curative instruction requested by the defense and agreed to by the Government,[2] the Court inquired further:

> THE COURT: With respect to - - anything else, Mr. Lewis, you wanted to bring up?
> MR. LEWIS: The phony document. There's just absolutely nothing to substantiate that that was a phony document. It's an original document, business certificate. He acknowledged his signature and it has a notary stamp and seal - - (TT 5729).

---

[2] This agreed upon curative charge, "Yesterday during the rebuttal summation there was reference to testimony of Joseph Sparano and Mr. Dember indicated that Mr. Sparano looked at his signature and disavowed that it was his signature, and I'm charging you that you may disregard that statement, and, in fact, that Joseph Sparano, during his testimony on May 27, never disavowed that it was his signature" (TT 5728-29) was never given to the jury. After the Court gave its own version, it immediately informed the jury: "And with that, finally, the case is yours." (TT 5736).

The Government argued that based upon the misspelling of his name and other evidence in the case, the jury could conclude the document was phony. The Court agreed:

> MR. LEWIS: Judge, the phony - - to phoniness of the document, based upon the argument, would be predicated upon him disavowing his signature.
> THE COURT: Well, no. I mean, to the extent he's looks like my signature but he's acknowledging that his name is misspelled, then at least there's some room for argument. I don't think it's a very good argument but it's argument.
> I think it's very different from saying what somebody testified to, and in fact, he didn't. I think there's conclusive proof of that, so I'm going to cure that error. The rest of it, it seems to me, is argument. I understand why think you have the better of the argument. I understand that. But if that were a basis for a mistrial, then we would be having mistrials in every case. Somebody has the better of the argument. (TT 5731).

The defense had cultivated its credibility with these jurors every day for two months of trial.

Now the Government was able to defeat that credibility by telling them the defense exhibit was a fraud.

> "Now, if you've learned nothing else from this case, you should have learned that Wayne Charles loves to fabricate documents and one of the fascinating documents you learned he provided, it wasn't introduced by us, it was actually introduced during cross examination of Joseph Sparano." (TT 5634-5635).

Now, in the contest of the rebuttal summation, where the Defendant could not respond, the Government without good faith basis tells the jury the defense is perpetuating a fraud by introducing a phony document; a document which was not phony; was signed as authenticated by the notary's stamp then and her affidavit now. The prejudicial effect was substantial.

This then dovetailed into the other strategic effort to undermine the credibility of the defense with the jury: the double billing.

The Government in its opposition papers states:

> "It was not the Government's intention to introduce a new matter by way of this argument, but instead, as explained above, to respond to Charles summation. Nor did the Government deliberately withhold this argument for rebuttal summation so that Charles would have no opportunity to respond to it." (Gov. opp. pg. 50).

Unfortunately, this is not believable. The rebuttal summation immediately followed the Defendant's summation. The double billing argument was predicated upon two vouchers from the hundreds that had been submitted by Micros Only over a four year period and was occasioned upon Michael Leigh's resubmitting the original May 21, 2001 voucher along with other May and June 2002 vouchers which Ann May again approved for payment in June of 2002. (Gov't Ex. 382). There is no way this was a non-planned response. The Government was locked and loaded, seizing on anything to spring its trap, and by doing so destroy the credibility the defense had cultivated with the jury from its opening statement.

Poker afficiandos recognize that even the best players have tells: an idiosyncracy or mannerism which predicts or precedes the play. Here, the prosecutor has a distinctive tell. Before he proceeds with anything questionable, he leads with a disclaimer. We see this in the discussion raised by co-defendant Post in asserting that the Government shifted the burden of proof when it argued that Post had not proven that the SEMAP scores showed that Micros Only's employment was the raison d'etre for the higher efficiency ratings. Before launching the argument, the prosecutor stated: "Now, keep in mind, defense has absolutely no burden of proof. The Judge has said to you many times, he'll say to you again in his charge, defense doesn't have to prove a thing in this case." (TT 5611). But then he embarks on his argument that defense counsel never proved the correlation with the SEMAP scores. The disclaimer is the tell.

So too, in his rebuttal summation as to double billing, we look for the introductory disclaimer, the tell: "But, you know, since Mr. Lewis brought this letter to your attention, I feel compelled to bring something else to your attention about this letter." (TT 5637).[3] There it is, the tell; he then springs the trap knowing full well it can never be explained or mitigated as nothing more than a billing error predicated upon Mike Leigh's re-submission after the approval by Anne May.  Instead he tells the jury:

> And here's the kicker. Here's the kicker. You go to the last page of Exhibit 382, what do you have? Oh, the payment record. See? Payment record. Payment was made. Okay? Wayne Charles billed twice.  Double billed. Double billed for over like $2500 and Constance Post signed off on it. There is no limit to his thievery. No limit whatsoever. He's double billing also. Just when you thought he had stolen all kinds of different ways, here's another way he's stolen. It's not enough.  (TT 5638-5639).

To suggest that the double billing came up as an unplanned response to defense counsel's summation is fiction.  It was planned, it was strategic, and it was prejudicial.[4]  The prejudice is proven by the fact that the first substantive note received from the jury asked for documents to support the double billing.  Court Exhibit I I:

---

[3] The letter having Jason Blake's signature dated June 1, 2001 (Gov't Ex. 567) was utilized during the Defendant's summation to show the signature the Government argued was a forgery was actually the signature of Jason Blake when compared to the other exemplars (C-JB-A, voter registration card; C-JB-B, mortgage) that he acknowledged were his signature or which were proven to be his signature.  The signature on the letter was used to discredit Blake's testimony that he had never seen the letter, and never signed the letter. This apparently had impact as the Government never even mentioned Jason Blake in its principal summation, distancing itself from his testimony.

[4] The Government argues that even if the Court were to conclude that the double billing was a matter improperly first raised in rebuttal, it did not cause substantial prejudice as the evidence proving guilt was overwhelming. In support of that contention, it asserts in a footnote (Gov. opp. pg. 51 fn. 14) that on February 9, 2011, during an argument by prior counsel on post-trial motions, the Court noted that the Government's proof at trial was "overwhelming".  As I have never been provided with a copy of that transcript, I cannot respond to that assertion or representation.

"P.S.1   Could somebody please help us find the double billing documents, Michael Leigh / Micros Only." (TT 5757).

The statements by the prosecution in its rebuttal summation, the mischaracterization of testimony, the prejudicial and erroneous claim of the phony defense exhibit and the double billing rebuttal trap, created a manifest injustice which supports the request for a new trial.

Dated: White Plains, New York
      March 7, 2016

Respectfully submitted,

**STEPHEN R. LEWIS, ESQ.**
**Stephens, Baroni, Reilly & Lewis, LLP**
*Attorneys for Defendant, Wayne Charles*
175 Main Street, Suite 800
White Plains, New York 10601
Telephone: (914) 683-5185

11

## <u>CERTIFICATION OF SERVICE</u>

**STEPHEN R. LEWIS**, an attorney duly admitted to practice law before the Courts of the United States, Southern District of New York, affirms the following under penalty of perjury:

That I am the attorney for Defendant, WAYNE CHARLES, in the above entitled action; that I am not a party to this action; and that on the 7th day of March, 2016, I served the annexed RESPONSE TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S RULES 29 AND 33 MOTIONS, by ECF upon the following:

> UNITED STATES ATTORNEY'S OFFICE
> Southern District of New York
> <u>Attention</u>: AUSA Andrew Dember and
>            AUSA Daniel Filor
> 300 Quarropas Street
> White Plains, New York 10601

Dated: White Plains, New York
       March 7, 2016

_____
Stephen R. Lewis, Esq.